737 A.2d 604

In re ADOPTION/GUARDIANSHIP NO. J970013
IN the CIRCUIT COURT FOR PRINCE
GEORGE'S COUNTY.

No. 1895, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 10, 1999.

244

Margaret L. Lanier, Asst. Public Defender (Stephan E. Harris, Public Defender, on brief), Baltimore, for appellant, James L.

Kenneth Wardlaw, Riverdale, on brief for the child.

Cathy A. Dryden, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee, DSS.

Submitted before MURPHY, C.J., and MOYLAN and KENNEY, JJ.

MOYLAN, Judge.

The appellant, James L., challenges a judgment in the Circuit Court for Prince George's County, Judge Robert Woods presiding, whereby his parental rights were terminated with respect to his son, Kevon T. The appellant raises the following issues for our consideration:

1.  Did the trial court err in finding that the appellant's incarceration was tantamount to a disability thus rendering him incapable of providing adequate care for his son?

2.  Did the trial court err in holding that the Department of Social Services was relieved of its statutory obligation to provide the appellant with the appropriate services?

Perceiving no error, we shall affirm the judgment of the trial court.

## Background

In November of 1991, Kevon T. was born to the appellant and Jacqueline T.[1] The appellant and Jacqueline apparently met while both were incarcerated at the Lorton Correctional Facility and working in the garment shop. Although Kevon was conceived while his parents were incarcerated, Jacqueline

---

1.  The trial court terminated parental rights with respect to both the appellant and Jacqueline T. Jacqueline T., however, has not appealed that ruling and this appeal concerns only the termination of parental rights with respect to the appellant.

was released prior to giving birth to Kevon. The appellant, however, is serving a sentence of twenty years to life for a drug-related first degree murder. He has been incarcerated since 1974. The appellant is currently 44 years old.

Because of the appellant's continuous incarceration, he earned an insignificant sum of money working within the correctional facility. Shortly after Kevon's birth, the appellant sent Jacqueline approximately $140 per month for child care. He later learned, however, that Jacqueline was apparently using the money to buy drugs rather than to care for Kevon. The appellant then lost his job within the facility and stopped sending Jacqueline money. At the time of trial, the appellant earned approximately $21 per month.

While incarcerated, the appellant has participated in a concerned fathers' group, has graduated from a drug program, and has been involved in stress and anger management programs. Between September of 1995 and January of 1997, the appellant had attempted to contact his son through the Prince George's County Department of Social Services (hereinafter "DSS"). For example, the appellant requested the telephone number of Kevon's foster family, and he was provided with the phone number. The appellant called twice. The appellant also requested visitation with Kevon. Beginning in February of 1998, Kevon met with the appellant in the facility, where the appellant talked to Kevon and bought him a soda. Kevon did not recognize the appellant. Kevon was brought to the correctional facility on three additional occasions in 1998 to meet with the appellant. Marsha Goldfine, a social worker for the DSS, testified at trial that despite Kevon's visits with the appellant, Kevon did not seem to be becoming more familiar with his father.

In March of 1997, the DSS filed a petition in the circuit court for guardianship with right to consent to the long-term care of Kevon.[2] Beginning on October 19, 1998, a hearing was

---

2. The petition filed by the DSS also concerned the guardianship of Donte T., a son born to Jacqueline T. and another inmate. Donte T., however, is not involved in the instant appeal.

held in the circuit court with regard to the termination of the appellant's parental rights. At the conclusion of the three-day hearing, the trial court granted the DSS's petition for guardianship and accordingly terminated the appellant's parental rights with respect to Kevon. This timely appeal followed.

### Standard of Review

In *In re Adoption/Guardianship No. 95195062/CAD*, 116 Md.App. 443, 696 A.2d 1102 (1997), we discussed the appropriate focus in cases involving the termination of parental rights. We there said:

> In decisions regarding the termination of parental rights, the best interest of the child has long been the guiding standard. Indeed, the child's welfare is of " 'transcendent importance.' " Termination of parental rights, however, implicates the fundamental constitutional right to raise one's own child. Because the right "is so fundamental . . . it may not be taken away unless clearly justified."

116 Md.App. at 453–54, 696 A.2d 1102 (citations omitted). We further noted that "the State bears the heavy burden of proving, by clear and convincing evidence, that termination of a parent's rights serves the best interests of the child." *Id.* at 454, 696 A.2d 1102. Additionally,

> [i]n reviewing the evidence presented below to determine whether the trial court's findings were clearly erroneous,
> our function * * * is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to support the * * * determination that it would be in the best interest of [the child] to terminate the rights of [the natural parent]. In making this decision, we must assume the truth of all of the evidence, and of the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court.

*In re Adoption No. 09598*, 77 Md.App. 511, 518, 551 A.2d 143 (1989). Moreover, in a case involving termination of

parental rights, "the greatest respect must be accorded the opportunity [the trial court] had to see and hear the witnesses and to observe their appearance and demeanor." . . . Where the best interest of the child is of primary importance, "the trial court's determination is accorded great deference, unless it is arbitrary or clearly wrong." *Scott [v. Dept. of Social Services,]* 76 Md.App. [357], 382–83 [545 A.2d 81] [1988].

*In re Adoption/Guardianship Nos. 2152A, 2153A, 2154A,* 100 Md.App. 262, 269–70, 641 A.2d 889 (1994).

### Long–Term Incarceration as a Factor

■ When determining whether the termination of parental rights is proper, a trial court is obligated to consider the multitude of factors enumerated in Md.Code Ann., Fam. Law § 5–313.[3] A court is additionally obligated to make "express findings of fact with regard to each statutory factor before a decision granting a petition to terminate parental rights may be sustained." *In re Adoption/Guardianship No. 95195062/ CAD,* 116 Md.App. at 460, 696 A.2d 1102. In the case *sub judice,* there is no dispute that the trial judge expressly set forth his decision for terminating the appellant's parental rights and the factors on which he based his decision. On this appeal we are concerned only with the adequacy of Judge Woods's consideration of the factor described in § 5–313(d)(1)(i), which provides:

(d) *Considerations following juvenile adjudication.* (1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependant child, the court shall consider the factors in

---

**3.** The trial court appropriately relied on the 1997 version of § 5–313 when making its analysis of the statutory factors. Because the sections relevant to this appeal have subsequently been reenacted without significant change, we quote the 1999 volume of the Family Law Article.

subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time[.]

A definition of the term "disability" can be found in Md.Code Ann., Fam. Law § 5–301(c). That section provides:

(c) *Disability.*—"Disability" means:

(1) a mental disorder, as defined in § 10–101 of the Health–General Article;

(2) mental retardation, as defined in § 7–101 of the Health–General Article;

(3) alcohol dependence, as defined in § 8–101 of the Health–General Article; or

(4) drug dependence, as defined in § 8–101 of the Health–General Article.

In the instant case, the trial court, when terminating the appellant's parental rights with respect to Kevon, explained as follows:

You would like to say, Mr. L., we'd like to do something for you. Had he testified that I am getting out of prison tomorrow, I have got a job, I am going to do whatever I can do, I want to take my child back and start anew, I would have seriously considered that. The problem is Mr. L. has been sentenced from 20 to life. Twenty years has passed. We know he's not coming up for [parole for] a couple of years, two or three years before he is reconsidered with no guarantees. For whatever reason, he's not going to get out of jail, and the possibility exists that he could be in jail for the rest of his natural life.

\*　　\*　　\*

... *And while I don't find that jail in and of itself, based upon the case law* even though I find no case really on all fours, *is a disability,* I find that it is in the best interest of the child, considering all of the factors in reference to the

father, that he cannot give the child and has not in the past given the child the adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical mental or emotional ties, but it says even if the parent is physically and financially able, he's not physically, he's not financially able, but emotionally I guess he is able. . . .

*I really would say to the Court of Special Appeals if this case goes up, this is just an exception to jail not being a disability because of the factual nature of the case itself.*

(Emphasis supplied).

The appellant maintains that despite case law to the contrary, the trial court erroneously determined that the appellant's incarceration was, in fact, a disability under § 5–313(d)(1)(i). In support of his position, the appellant relies on our decision in *In re Adoption/Guardianship Nos. CAA92–10852 and CAA92–10853,* 103 Md.App. 1, 651 A.2d 891 (1994) (hereinafter "*Adoption CAA92*"), and he concludes:

[A] "disability" means a physical or mental illness or addiction. The record here does not reflect that the appellant father has any such condition. Accordingly, the court erred in concluding that he suffers from a disability.

In *Adoption CAA92,* we addressed for the first time whether a parent's incarceration could constitute a "disability" within the meaning of Md.Code Ann., Fam. Law § 5–301(c). Specifically, William F., the father of twin sons, had been convicted of drug distribution and sentenced to two years probation along with a requirement that he complete a nine-month drug treatment program. At the time of the hearing before the circuit court on the issue of the twins' guardianship, William F. was still incarcerated and was awaiting the commencement of his drug treatment program, which was scheduled to being approximately two weeks after the hearing. 103 Md.App. at 8–9, 651 A.2d 891.

The trial court concluded that William F.'s incarceration was, in fact, a disability, because he was "unable to care for the immediate and ongoing needs of the children," as required

by § 5–313(d)(1)(i). William F. appealed and challenged the termination of his parental rights on the basis that the trial court erred in finding that his incarceration constituted a "disability."

Judge Alpert, writing for our Court in *Adoption CAA92*, explained:

The question of whether a parent's incarceration constitutes a "disability" is an issue of first impression in this state. We agree with the appellant that the court erred when it found that William's imprisonment was a "disability," for several reasons. First, the term "disability" is defined in section 5–301(c) and is expressly limited to mental disorders, mental retardation, chronic alcoholism, and drug addiction. Md.Code Ann., Fam. Law § 5–301(C). Even assuming the definition of "disability" was not so limited, this Court has refused to expand by judicial fiat the definition of this term to include other impediments to a parent's ability to care for his or her child. In *In re Adoption No. 2428*, 81 Md.App. 133, 138, 567 A.2d 139 (1989), for example, we held that a mother's minority did not constitute a disability on the basis that it was not included in the statutory definition.

*Moreover, William's incarceration was temporary, and not permanent or long-term in nature as section (d)(1)(i) contemplates.* At the time of trial, William had been incarcerated for approximately nine months. Within a week or two after trial, however, he was scheduled to begin a nine-month drug rehabilitation program. According to William, he would be allowed to visit his sons during this program. *Following the completion of the program, William would be free,* subject to the terms of his probation. Thus, the trial court erred not only in finding that William's incarceration constituted a "disability," but also in holding that his imprisonment rendered him "consistently unable" to provide for the children's needs "for long periods of time." *The incarceration of a parent does not per se constitute a disability* under 5–313(d)(1)(i) and justify the termination of his or her parental rights.

103 Md.App. at 29–30, 651 A.2d 891 (footnote omitted; emphasis supplied). Thus, our Court concluded that under the facts before us in *Adoption CAA92*, William F.'s incarceration did not constitute either a literal "disability" within the contemplation of § 5–301(c) or a dispositive circumstance otherwise justifying the termination of parental rights.

We agree entirely with the appellant's assertions that his incarceration does not literally qualify as a disability under the statutory definition found in § 5–301(c) of the Family Law Article. Despite the appellant's assertion to the contrary, Judge Woods never found that it was. He simply found, in considering the totality of the circumstances, that the long-term incarceration of the biological father with an indefinite termination date was a significant factor in assessing the best interests of the child. Our holding in this case does not expand the statutory definition so as to include incarceration within the meaning of "disability." As we said in *Adoption CAA92*, "[t]he incarceration of a parent does not **per se** constitute a disability." 103 Md.App. at 30, 651 A.2d 891 (emphasis supplied). We reaffirm that holding.

Given the appropriate set of factual circumstances, however, incarceration may indeed, under the facts of a particular case, be a critical factor in permitting the termination of parental rights, because the incarcerated parent cannot provide for the long-term care of the child. Under such circumstances, the best interests of the child may warrant the termination of parental rights. "[T]he controlling factor, or guiding principle, in adoption and custody cases is not the natural parent's interest in raising the child but rather what best serves the interests of the child." *In re Adoption/Guardianship No. A91–71A*, 334 Md. 538, 561, 640 A.2d 1085 (1994). Therefore, "in all cases where the interests of a child are in jeopardy the paramount consideration is what will best promote the child's welfare, a consideration of 'transcendent importance.'" *Id.* *See also In re Adoption/Guardianship No. 3598*, 347 Md. 295, 323, 701 A.2d 110 (1997) ("[T]he 'golden rule' has always been the best interest of the child."). Given

the appellant's situation and all of the surrounding circumstances, Judge Woods was acting in the best interests of Kevon T. in terminating the parental rights of the appellant. We cannot hold that he was clearly erroneous in finding that it was not in the best interests of Kevon T. to have his status placed in suspended animation until 2001 or even beyond waiting for the appellant's potential for parole to be realized, an occurrence that the trial court noted may never come to be.

The facts in this case, moreover, are sufficiently distinguishable from those in *Adoption CAA92* to warrant the conclusion that the appellant's incarceration did in this case justify termination where there it did not. In *Adoption CAA92*, William F.'s incarceration was characterized as "temporary" and "not permanent or long-term in nature." 103 Md.App. at 29, 651 A.2d 891. In *Adoption CAA92*, William F. was to be "free" following the completion of a nine-month drug rehabilitation program. *Id.* In this case, the appellant testified on cross-examination regarding his status of incarceration:

Q: What are you incarcerated for, sir?

A: First degree murder.

$$* \qquad * \qquad *$$

Q: And what is your actual sentence?

A: Twenty to life.

Q: And when was the last hearing, the last parole, the last time you met with the Parole Board?

A: March, when I got the 2001 date.

Q: March of 1998?

A: Yes, ma'am.

Q: Okay. And they denied you parole on that day?

A: Yes, ma'am.

Q: And they gave you a new date of March of 2001?

A: 2001.

Unlike the situation before the Court in *Adoption CAA92* where an affirmative release date had been established for William F., the appellant is not scheduled even for parole consideration again until 2001, and there is no guarantee that

the appellant will at that time, in fact, be paroled. As the trial court noted, a distinct possibility exits that the appellant will remain incarcerated for the rest of his natural life.

Regardless of the appellant's assertions that the trial court specifically determined that the incarceration was a "disability," we do not find that to have been the case. The trial judge in his opinion said: "[W]hile I don't find that jail in and of itself ... is a disability," it was nevertheless in the best interest of the child to terminate the appellant's parental rights. The trial court accordingly based its decision to terminate the appellant's parental rights on what was in the best interest of Kevon, and we are not persuaded that the lower court's decision in that regard was "arbitrary or clearly wrong."

### Obligation of DSS to Provide Services to Appellant

During the course of the three-day hearing regarding the termination of the appellant's parental rights, counsel for the DSS conceded that no services had been offered to the appellant and that no service agreements were presented to him for consideration. The appellant now claims that the trial court erred in terminating his parental rights when the requisite services had not been offered to him.

Md.Code Ann., Fam. Law § 5–524, titled "Child welfare services," lists the general obligations of the DSS to the child and parent in such cases. That statute provides:

The Administration shall provide child welfare services to a child and the child's parent or guardian:

(1) to assist in preventing the necessity of placing the child outside of the child's home;

(2) to reunite the child with the child's parent or guardian after the child has been placed in foster care; or

(3) if the child has been placed in foster care and cannot return to the child's parent or guardian, to develop and implement an alternative permanent plan for the child.

Returning to § 5–313, subsection (c) provides:

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural

parent's right as to the child in any case, except the case of an abandoned child, the court shall give:

\*     \*     \*

(2) consideration to:

(i) the timeliness, nature, and extent of services offered by the child placement agency to facilitate reunion of the child with the natural parent[.]

Subsection (d)(3) also provides that a court

... may waive the child placement agency's obligation under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child.

The trial court, when analyzing the statutory criteria of § 5–313, explained as follows:

*[T]he Department wants me to waive all of their requirements of what they shall do for reunification by clear and convincing evidence. I do waive them* ... The unusualness of the circumstances with the record, here's a man I guess in everyone's reason, I didn't realize they mixed prisoners. Here's a man that conceived a child while in jail, and had been in jail for some time.

(Emphasis supplied). Accordingly, the trial court waived any obligation of the DSS to provide services to the appellant under § 5–313(d)(3) due to the "unusual" circumstances presented by the case.

In *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 642 A.2d 201 (1994) (hereinafter *"Adoption 10941"*), the Court of Appeals held that reunification services need not be offered by the DSS under every conceivable set of circumstances. The Court there explained:

[W]here ... attempts at reunification would obviously be futile, the Department need not go through the motions in offering services doomed to failure.

335 Md. at 117, 642 A.2d 201. In that case, the Court specifically determined that the DSS was not obligated to provide reunification services to the mother, Sandra L., because her persistent and ongoing psychiatric problems had rendered her permanently unfit to raise her son, Ivan. The Court explained:

> Most importantly, Sandra's problems are persistent and ongoing. They do not represent a temporary crisis or an unfortunate string of bad luck ... Although we sincerely hope that Sandra one day finds mental and emotional stability, we cannot leave Ivan in legal limbo waiting for an event that likely will never happen.

335 Md. at 119, 642 A.2d 201. The Court then concluded:

> Since no amount of reunification services by the Department would likely result in reunification of Ivan and his parents, the Department need not meet its obligations under F.L. § 5–524 in order for the circuit court to terminate the natural parents' rights under F.L. § 5–313.

*Id.; See also Adoption CAA92, supra,* 103 Md.App. at 19–20, 651 A.2d 891.

The appellant attempts to distinguish *Adoption 10941* from his own situation because, unlike in *Adoption 10941,* "the appellant father is not ill, mentally or otherwise." The appellant reads *Adoption 10941* too narrowly. Granted, no allegation was made that the appellant suffers from a mental or psychological illness like Sandra L. Very much like Sandra L., however, the appellant's condition of incarceration is "persistent and ongoing" and it is not a "temporary crisis" likely to dissipate in the near future. We reiterate what the trial court recognized: there is a possibility that the appellant will remain incarcerated for the rest of his life. The appellant can offer no definite information regarding his potential for parole other than that "[h]e may be paroled at some point in the relatively near future."

We, therefore, reach the same conclusion that the Court of Appeals did in *Adoption 10941:* we will not put Kevon's welfare in "legal limbo" while waiting for the scant

possibility that the appellant will be released in the near future. The trial court accordingly properly found that under § 5–313(d)(3), the DSS was relieved of any obligation to provide the appellant with services for reunification.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*