911 A.2d 464

**In re ADOPTION/GUARDIANSHIP OF HAROLD H.**

**No. 0464, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Nov. 30, 2006.

Claudia A. Cortese (Nancy S. Forster, Public Defender, on brief), for appellant.

Pamela L. Smith, Riverdale (Legal Aid Bureau, Inc., on brief), and Kathleen E. Wherthey, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellees.

Panel HOLLANDER, ADKINS, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

ADKINS, J.

Appellant, Mojisola A., asks us to review the decision of the Circuit Court for Prince George's County to terminate her parental rights with respect to her son, Harold, who was born on February 7, 1995. The unfortunate victim of a severe stroke in 2001, when she was only 41, appellant has resided in a nursing home since that date, while Harold lived elsewhere. Asserting her constitutional rights as a parent, applicable statutes, and judicial precedent, Ms. A. argues the circuit court erred in terminating her parental rights on the grounds of her stroke-induced neurological deficits. Mindful of Ms. A's lamentable plight, we are nonetheless persuaded that the circuit court acted within its discretion and without error in terminating her rights in order to preserve Harold's best interests.

## BACKGROUND

Mojisola A. (Ms. A.) is the mother of Harold H. She had children through a previous marriage to Mr. Akin S., and after divorcing Mr. S., Ms. A. became involved with Harold's father. Harold was born on February 7, 1995, in North Carolina.[1]

Harold developed a close relationship with Mr. S., and with the children of Mr. S. and his mother. Harold and his mother moved to Maryland before Harold was four years old. The parties agree that, from his birth through March 6, 2001, his mother took good care of Harold and was a fit parent.

On March 6, 2001, Ms. A. suffered a severe stroke, possibly arising from injuries she sustained in a 1999 car accident.

---

1. Harold's father was served by publication and failed to file any objection. Therefore, he was deemed to have consented to the termination of parental rights. Harold's father is not a party to these proceedings.

After the stroke occurred, Ms. A. was hospitalized, suffered serious complications, and almost died several times. On October 9, 2001, Ms. A. left the hospital and entered Heartland Homes Healthcare facility ("Heartland"), which is a nursing home. As a result of the stroke, Ms. A. suffered damage to the right hemisphere of her brain.

When Harold's mother was hospitalized by this stroke, he was initially cared for by Ms. A.'s brother in California. Then Harold went to live with family friends in Prince George's County, Maryland. On March 25, 2002, these friends brought Harold to the Prince George's County Department of Social Services ("DSS"), requesting that he be placed in foster care.

DSS worked for a period of time to reunify Harold with his biological father, Mr. H. To do this, DSS arranged visits between Harold and his father in Maryland and North Carolina. This did not work out, however, and Mr. H. was "greatly relieved" when DSS suggested that he give up his parental rights or allow Harold to be adopted. Harold was never especially happy to be with his father, and has no particular attachment to him.

Harold's first foster mother, Ms. W., took care of him until July 2005. Harold still has a positive relationship with Ms. W., whom he calls "grandma." DSS was worried about the long term possibility of Ms. W. caring for Harold, as she is elderly and has no willing or able family members to care for Harold if she becomes unable to do so.

Therefore, in July 2005, DSS arranged for Harold to be transferred to another foster home, and he was placed with a new foster mother, Ms. McC. Ms. McC. is a schoolteacher, and Harold has done well in her care. Ms. McC. facilitates contact with Harold, his mother, and his half-sister, and she is willing to allow continued contact with his family and accommodate his potential future adoption by one of them. Currently, Harold receives weekly therapy, as arranged by DSS, to allow him to cope with the changes in his life. Harold has adjusted well in school, is a "B" student, and has no behavioral problems. Harold has bonded with his current foster family,

and he refers to Ms. McC. as "Mom." Harold also gets along well with Ms. McC.'s adopted son, Andre, who is Harold's age. Harold has a brother-like relationship with Andre, and they play video games, basketball, and complete their homework together.

Ms. A. remains in residence at the Heartland nursing home. Dr. James Lewis, a clinical psychologist and neuropsychologist, performed a court-ordered neuropsychological evaluation of Ms. A. in July 2004, and has reviewed Heartland's records about her condition since that evaluation. Dr. Lewis testified that Ms. A.'s medical records show that she suffered from a right-hemisphere hemorrhagic stroke. Dr. Lewis stated that a hemorrhagic stroke causes the greatest morbidity, which means long term permanent deficit. Ms. A.'s left-brain IQ measured 83, which is at the bottom of the low average range, and her right brain IQ measured 65, which is in the mentally retarded range. She tested in the "severely brain impaired range" on skills concerning "thinking, planning, judgment, reasoning, awareness of oneself and others." Dr. Lewis testified that there is no reason to expect major recovery of function. Moreover, he stated that he sees the most improvement in patients like Ms. A. in the first six to twelve months after the stroke. According to Dr. Lewis, "sudden spontaneous recovery of function from her stroke that did not occur in the first five years . . . does not happen."

Ms. A. also suffers from dementia, and has an inability to grasp the severity, nature, and extent of her medical problems. For instance, she shows unawareness that she has suffered a stroke. Further evidence of Ms. A.'s dementia is seen through her actions at the nursing home. She has been observed carrying her own feces in a container, without being aware of it. She also asks for medication that she has already taken.

Since Dr. Lewis evaluated Ms. A. in 2004, her condition has worsened, as she now shows "more disorientation, more confusion," and now requires assistance with maintaining her bowel and bladder control. Although she does not need assistance

with her eating or bathing, she needs "prompts and cues" to reorient her to her surroundings as she moves through different areas of the nursing home. Ms. A.'s social worker designee at the nursing home testified that she believes the best condition Ms. A. can expect to attain is "assisted living" status, which would still require 24–hour supervision.

The Department of Social Services social worker testified that Ms. A. cannot make independent decisions for herself, and therefore, could not be expected to make decisions for Harold. The social worker designee for Ms. A. at Heartland confirmed that Harold's mother has no financial decisions to manage, as Maryland Medicaid is paying for her nursing home care.

Ms. A. is capable of conversing with others, and testified in this case. Her testimony, however, revealed some of her confusion. At the trial, she said Harold was 9, when he was actually 11. She testified that she "[had] no idea" why she came to the nursing home, and had "no idea why I'm there." She said she had resided in the Heartland facility since 1999 (immediately after her car accident), when it was actually 2001.

Ms. A. stated that she does not want the court to terminate her parental rights because she believes she can take care of Harold. Although she has not driven since 2001, she testified that she can drive Harold to school. She also said she could help him with homework, cook for him, and make sure he sees the doctor. She admitted that she cannot have Harold live with her at the nursing home, but could not explain how she could take care of Harold while she lives at Heartland.

Ms. A. testified that "I love [Harold] with my whole heart." Harold loves his mother also, and continues to visit her in the nursing home periodically. The frequency of the visits is not clear from the record.

## LEGAL PROCEEDINGS

After a shelter hearing, a master declared Harold a child in need of assistance on April 23, 2002. The circuit court ratified

this decision on May 15, 2002. After an unsuccessful effort to terminate the rights of Harold's parents in 2004, DSS reinstituted proceedings to terminate parental rights in 2006.[2]

There was a hearing held on March 1 and 2, 2006 in the Circuit Court for Prince George's County. Harold H.'s father was notified by publication, but filed no objection, and he did not appear at the hearing. The attorney representing Harold agreed with DSS that Ms. A. has a disability, and her parental rights should be terminated. On March 2, 2006, the circuit court granted DSS's petition to terminate the parental rights of Mr. H. and Ms. A. Ms. A. then filed this appeal, in which she asks the following question:

> Did the trial court err in finding that Appellant had a disability and in using this erroneous finding to justify termination of her parental rights?

## STANDARD OF REVIEW

In termination of parental rights cases, the standard of review is "whether the trial court, in making its determination, abused its discretion or made findings of fact that were clearly erroneous." *In Re Adoption/Guardianship No. 3598*, 347 Md. 295, 311, 701 A.2d 110 (1997). In such cases, "the greatest respect must be accorded [to] the opportunity the [trial court] had to see and hear the witnesses and to observe their appearance and demeanor." *In re Adoption/Guardianship No. J970013*, 128 Md.App. 242, 247–248, 737 A.2d 604 (1999) (citation omitted). Therefore, the circuit court's determination is given great deference, unless it is arbitrary or clearly wrong. *Id.* at 248, 737 A.2d 604.

## DISCUSSION

Md.Code (1984, 2004 Repl.Vol.), section 5–313(a) of the

---

2. The circuit court denied the petition in May 2004 without prejudice, finding there was insufficient medical evidence regarding Ms. A.'s future prognosis. Dr. Lewis's evaluations had not taken place at this time.

Family Law Article (FL) [3] authorizes a court to grant a decree of guardianship under certain circumstances, without a natural parent's consent, "if the court finds by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights as to the child." One of these circumstances is when, "in a prior juvenile proceeding, a child has been adjudicated to be a child in need of assistance." FL § 5–313(a)(2). FL section 5–313(c) requires that the court shall give "primary consideration to the safety and health of the child," and it identifies the particular factors that must be considered by a court deciding a termination of parental rights case. We address those later. As the statutory provisions must be considered against the backdrop of a parent's constitutional rights, we pause to review those rights first.

The United States Supreme Court and the Maryland Court of Appeals have repeatedly recognized the fundamental rights of parents to raise their children as they choose. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982); *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000); *McDermott v. Dougherty*, 385 Md. 320, 334–51, 869 A.2d 751 (2005). Thus, any termination of parental rights under FL section 5–313 must not violate these fundamental rights. *See In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. 666, 669, 796 A.2d 778 (2002)(hereafter referred to as *"No. 36"*).

■ As the Court of Appeals explained, "Maryland has declared that a parent's interest in raising a child is a fundamental right that cannot be taken away unless clearly justified." *Id.* at 670, 796 A.2d 778. In addition, "the State bears the heavy burden of proving, by clear and convincing evidence, that termination of a parent's rights serves the best interests of the child." *In Re Adoption/Guardianship No. J970013*, 128

---

**3.** The statutory section providing the criteria for a termination of parental rights was recodified effective January 1, 2006. Because this case commenced before January 1, 2006, and the recodified statute has only prospective effect, the pre–2006 section 5–313 is the controlling statute for this appeal.

Md.App. at 247, 737 A.2d 604 (citation omitted). The Supreme Court underscored the importance of strictly applying this standard when it concluded, "[i]f anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." *Santosky*, 455 U.S. at 753, 102 S.Ct. at 1394–95.

■ Nevertheless, the Court of Appeals has recognized that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *Boswell v. Boswell*, 352 Md. 204, 219, 721 A.2d 662 (1998). Moreover, "the controlling factor in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interest of the child." *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 113, 642 A.2d 201 (1994).

### Court Of Appeals 2002 Decision In *In re Adoption/Guardianship No. 36*

In *No. 36*, the Court of Appeals faced an arduous task in reviewing a trial court's decision to terminate the parental rights of Mr. F., the father, who had diminished cognitive functioning. In this important decision, the Court vacated the lower court's decision, finding insufficient proof to meet the stringent requirements in termination cases:

> Our holding today reflects the idea that fundamental constitutional rights, i.e., the child rearing rights at issue here, can only be completely terminated upon the clearest and most convincing evidence that the parent, however poor, uneducated, or disabled, cannot and will not, even with proper assistance, be able to sufficiently parent his children in the reasonable future.

*Id.* at 699–700, 796 A.2d 778.

The Court of Appeals also declared a strong presumption that the best interests of a child, generally, are met by not terminating the parental rights of natural parents:

In cases where the termination of parental rights is involved, there is, as we have said, a strong presumption that the child's best interests are served by maintaining parental rights. It is only when clear and convincing evidence exists that the child's best interests are served by termination, may a parent's constitutional right to parent his child be permanently foreclosed.

*Id.* at 692, 796 A.2d 778.

Ms. A. maintains that she stands in the same position as Mr. F., and that *No. 36* is compelling precedent for reversal in this case. We see material distinctions between the two cases, which we discuss below.

Mr. F.'s cognitive functioning and abilities in *No. 36* differed markedly from Ms. A.'s current condition. In *No. 36*, the circuit court terminated the parental rights of Mr. F., because of his diminished intellectual abilities. *See id.* at 679, 796 A.2d 778. These deficits temporarily resulted in an inability to provide food for his two children and loss of electricity. In reversing that decision, the Court of Appeals held that DSS failed to provide the father with any specialized services to assist in parenting with his intellectual and cognitive skill levels. *See id.* at 682, 796 A.2d 778. The Court also focused on key facts about Mr. F.:

[The father] proffers that he has completed his education, obtained a driver's license, has secured employment, and maintains his own residence, indicating that he can, in fact, parent his own children.

*Id.* at 684, 796 A.2d 778.[4]

In contrast, Ms. A. has lived in a nursing home facility since 2001, and has enjoyed only brief visits with Harold.[5] Ms. A.

---

**4.** The Court in *No. 36* also found that "[the father] had made extensive and extraordinary efforts to further reunification with his children." *Id.* at 694, 796 A.2d 778.

**5.** Additionally, in the case of Mr. F., the Court recognized the availability of additional services that could help him. "[I]t is asserted by [the father], and by his expert witness, and amicus curiae that additional

possesses none of Mr. F.'s enumerated skills and accomplishments. She cannot drive, does not hold a job, and cannot maintain a residence independently of a nursing home. Her inability to provide for Harold's care and residency, despite her love for him, is a critical distinction between this case and *No. 36.*

There are other distinctions. In *No. 36,* the Court of Appeals also considered inadequate the expert testimony that Mr. H. was disabled and unfit to parent. When assessing the psychiatrist's evaluation, the Court of Appeals opined:

Dr. Blumberg's testimony was, admittedly, conjectural and speculative. A parent's right to parent should rarely, if ever, be terminated based upon conjectures and speculation. The record even reflects that there was little basis for the conjectures and speculation furnished by Dr. Blumberg.

*Id.* at 685, 796 A.2d 778. Additionally, the Court criticized Dr. Blumberg's testimony on the basis that the expert "noted that standard testing was not and could not be completed because of petitioner's inability to read well." *Id.*

Here, the testimony by Dr. Lewis was not based upon conjectures and speculation. He testified extensively as to the long term effects of a hemorrhage type stroke, the three stages of recovery, and the results of his neuropsychological testing of Ms. A. Dr. Lewis explained these results, stating that "three years post-stroke her left-brain IQ or verbal IQ was 83, which is the bottom of the low average range. But, her right-brain, her performance IQ[,] was 65, which is in the mentally retarded range."

Lewis further reported the results of neuropsychological tests, stating that "the most severe impairment other than the left-body side difficulties, were with the neuro cognitive measures. Thinking, planning, judgment, reasoning, awareness of oneself and others, those tasks all fell in the severely brain

---

services that are particularly appropriate for someone in petitioner's situation are available." *Id.* at 694, 796 A.2d 778. Here, Ms. A. never argued that additional services are available to assist her in independently parenting Harold.

impaired range." The test results enabled Dr. Lewis to opine that Ms. A. could not care for her son, as she could not live independently, and had no prospects for doing so.

Q: And, in your professional opinion[,] with a reasonable degree of probability in your field, does [Ms. A.'s] disability render her permanently incapable of caring for her son, H.?

A: Yes, by five years post-stroke what we are seeing is evidence of permanent deficit, and in [Ms. A.'s] case, unfortunately, it's not just that her deficits are permanent, but that there's repeated dementing changes, so continued expectation of slowly progressive deterioration over time.

Q: Is there any indication, based upon your review of the medical records, and your evaluation of [Ms. A.], that she would ever be able to live independently?

A: That would [imply] that at five years post-stroke there would be some sudden spontaneous recovery of function from her stroke that did not occur in the first five years. That does not happen.

This contrasts sharply with the testimony of Dr. Blumberg, who "failed to furnish his opinions to any degree of medical probability." *Id.* The Court of Appeals also concluded that Dr. Blumberg's testimony fell short because "[t]here was no scientific evidence that Mr. F. was mentally impaired," and the doctor "apparently presumed that he was, but undertook no tests to establish the extent, if any, of such impairment." *Id.* at 695, 796 A.2d 778.

The fears of speculation raised in *No. 36* are not present here, because Dr. Lewis's evaluation was extensive and based on well-established methods of neuropsychological testing. Here, the tests were conducted, and the extent of Ms. A.'s impairment was clear, as Dr. Lewis concluded that "[t]his patient has evidence of being unable or disabled[,] having impaired capacity to carry on self-care and independent parenting." In sum, we do not consider that *No. 36* controls the outcome here, because the medical evaluations, testing, and diagnosis, confirmed that Ms. A. differs from Mr. F., because she cannot live with Harold, provide him a residence, protect

his health and safety, or exercise any parental judgment. Unlike Mr. F.'s case, here there was "ample evidence to properly conclude that [Ms. A.'s] disability ... renders [her] permanently incapable of caring for [her] children in an unsupervised setting." *Id.* at 697, 796 A.2d 778.

■ The Court of Appeals has cautioned:

The termination of fundamental and constitutional parental rights is a "drastic" measure, and should only be taken with great caution, after extensive consideration of each of the relevant statutory considerations set forth in section 5–313.

*Id.* at 699, 796 A.2d 778. Nevertheless, the presumption that a child's best interests are best served while in the custody of his natural parents can be rebutted by "evidence of unfitness or **exceptional circumstances,** and when, weighed against the best interest of the child, parental rights may be trumped." *In re Caya B.,* 153 Md.App. 63, 76, 834 A.2d 997 (2003)(emphasis added and citation omitted). Keeping in mind the caveat voiced by the Court of Appeals, and the presumption that a child's best interests generally are not met by terminating parental rights, we now examine the circuit court's determinations regarding the application of section 5–313 factors to Ms. A.'s situation.

### Trial Courts Application Of FL Section 5–313 Factors

■ Harold was adjudicated a child in need of assistance more than four years ago. Therefore, the circuit court properly began its analysis by recognizing that Harold's prior CINA adjudication is a circumstance justifying a termination of parental rights, so long as certain other requirements are considered by the court. *See* FL § 5–313(a)(2).

Section 5–313(c) identifies these other requirements. The statute provides:

(c) Required considerations.—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall give:

(1) primary consideration to the safety and health of the child; and

(2) consideration to:

(i) the timeliness, nature and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(iii) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(iv) the child's adjustment to home, school and community;

(v) the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

1. the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

2. if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

3. the maintenance of regular communication by the natural parent with the custodian of the child, and

4. whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(vi) all services offered to the natural parents before the placement of the child, whether offered by the agency to

which the child is committed or by other agencies or professionals.

FL § 5–313(c).

In properly considering these 5–313(c) factors, the circuit court determined that the primary consideration, the health and safety of the child, was currently being met in foster care. The court found, "Harold is healthy, in a safe environment." It cited evidence that supports this conclusion, including Harold's involvement with his basketball team, his positive behavior, and Ms. McC.'s compliance with DSS qualifications. There was no evidence of how Ms. A. could maintain a healthy and safe environment for Harold while she was in the nursing home.

When addressing FL sections 5–313(c)(2)(i) and (ii), the court found:

> [W]ith respect to the timeliness and extent of services offered by the child placement agency to facilitate reunion with the natural parent, there is no evidence that the child placement agency exercised any efforts and there is a perfect reason for that in that the disability, which I will go into later, that his mom suffered is such that reunion or reunification with his [natural] mom at this time is not really a course that the Department can and should go through, since her prognosis is such that she will not likely in the near future be able to take care of herself and, consequently, be able to take care of her son in the way that a parent must and needs to.

Ms. A. does not argue that there were any support services that would enable her to care for Harold.

The court then spoke to the factors in sub-sections 5–313(c)(2)(iii) and (iv), regarding Harold's feelings towards his natural parents, and his current adjustment to his home, school, and community. The court determined that "[t]he child has emotional ties with not only his natural parent, but also his half siblings." The court concluded that he adjusted well to his life in a foster home.

Regarding factor 5–313(c)(2)(v), the court decided that "the disability that Harold's mother suffered as a result of the stroke in a way here is one of the cruelest type of disabilities of all that a parent could suffer in that it affects her ability to self-actualize her current situation with respect to her limitations." The circuit court concluded its analysis of the section 5–313(c)(2) factors by finding that returning Harold to his natural parent within an ascertainable time is not foreseeable, given Ms. A.'s condition. We see no error in the circuit court's findings and conclusions about the section 5–313(c) factors.

Finally, the circuit court is required to address any additional applicable factors in section 5–313(d):

(d) *Considerations following juvenile adjudication* (1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist[.]

The 5–313(d) factor applicable to Ms. A.'s situation provides:

(i) the natural parent has a **disability** that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time

FL § 5–313(d)(i)(emphasis added).

■■■ Ms. A. argues that this factor does not apply to her, citing this Court's 1994 conclusion that the term "disability" is statutorily limited "to mental disorders, mental retardation, chronic alcoholism, and drug addiction." *In re Adoption/Guardianship Nos. CAA 92–10852, 92–10853,* 103 Md. App. 1, 29, 651 A.2d 891 (1994). Ms. A. maintains that she was the unfortunate victim of this stroke, and the statutory term "disability" does not encompass her condition, because she did not abuse, hurt, abandon, or neglect Harold. We agree that Ms. A. is an unfortunate victim of her stroke, and

thus, these proceedings are particularly agonizing to all persons involved. But we do not agree that a showing of intentional misconduct, or even culpable neglect, is required in termination cases.

The Family Law Article defines "disability":

(c) *Disability.*—"Disability" means:

(1) a **mental disorder,** as defined in § 10–101 of the Health–General Article;

(2) mental retardation, as defined in § 7–101 of the Health–General Article;

(3) alcohol dependance, as defined in § 8–101 of the Health–General Article; or

(4) drug dependence, as defined in § 8–101 of the Health–General Article.

FL § 5–301(c)(emphasis added).

The Health–General Article further defines "mental disorder":

(f)(1) "Mental disorder" means a behavioral or emotional illness that results from a psychiatric **or neurological disorder.**

(2) "Mental disorder" includes a mental illness that so substantially impairs the mental or emotional functioning of an individual as to make care or treatment necessary or advisable for the welfare of the individual or for the safety of the person or property of another.

(3) "Mental disorder" does not include mental retardation.

Md.Code (1982, 2005 Repl.Vol.), § 10–101(f)of the Health–General Article (HG)(emphasis added).

The circuit court found,

[T]he Court is persuaded by the testimony of Doctor Lewis, as well as the subsequent testimony of [Ms. A.], that she does have a disability that has compromised her ability to self-actualize. Specifically when going over her testimony she was unable to distinguish between the accident and the stroke . . . as well as the age of Harold. . . .

The testimony that the court relied upon included Dr. Lewis's neuropsychological evaluation of Ms. A., documenting Ms. A.'s "profound neurocognitive deficits with judgment, deficits in higher level thinking and reasoning, lack of awareness of danger, [and] poor recognition of ways that she herself could be exploited." Dr. Lewis concluded that "this patient has evidence of being unable or disabled[,] having impaired capacity to carry on self-care and independent parenting." The trial testimony also reveals that Ms. A. exhibits symptoms of dementia and displays behavior such as carrying her own feces around in a container and wandering away in the middle of conversations. Thus, contrary to Ms. A.'s contention, the trial court's conclusion that Ms. A. has a "disability" within the meaning of section 5–313(d) was well-supported by the evidence.

Indeed, the characterization of Ms. A. as disabled was not disputed at trial. Ms. A.'s attorney acknowledged, "Your Honor, and I'm not going to make my argument based upon the issue of the disability[;] it flies in the face of the evidence that has been submitted in this case."

## CONCLUSION

In sum, the trial court did not err in concluding that Ms. A.'s stroke has rendered her unable to adequately parent Harold in the foreseeable future. The circuit court made no erroneous findings of fact when it found that this stroke left her with neurological deficits that meet the statutory definition of "disability." In light of the section 5–313 factors considered, and Ms. A.'s dismal long term prognosis, her constitutional right to raise her own child must give way to the best interests of Harold. The circuit court acted within its discretion to terminate her parental rights.

**JUDGMENT FOR THE CIRCUIT COURT OF PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**