REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 1470
September Term, 2013

IN RE: ADOPTION/GUARDIANSHIP

OF JASMINE D.

Meredith,
Woodward,
Sharer, J. Frederick
        (Retired, Specially Assigned),

JJ.

Opinion by Woodward, J.

Filed: June 30, 2014

On September 5, 2002 Jasmine D. ("Jasmine") was born to appellant, Stephanie N. ("Ms. N.") and an unknown father. Jasmine was three years old when she first entered foster care, and has spent over five of her eleven years of life in foster care as a result of Ms. N.'s alcoholism. Jasmine's most recent placement in foster care began on November 4, 2009, and continues to the present. On December 2, 2009, Jasmine was adjudicated a Child in Need of Assistance ("CINA") in the Circuit Court for Howard County, sitting as a juvenile court, and she was placed in the care and custody of appellee, the Howard County Department of Social Services (the "Department").

When its efforts toward reunification with Ms. N. failed, the Department filed a Termination of Parental Rights ("TPR") petition in the juvenile court on March 18, 2013. After a trial held on August 28 and 29, 2013, the juvenile court found that Ms. N. was an unfit parent and that termination of parental rights would be in Jasmine's best interests, and thus issued an order terminating Ms. N.'s parental rights.

Ms. N. appealed and presents one question for our review: Did the trial court err in terminating [Ms. N.'s] parental rights? We answer this question in the negative and accordingly affirm the judgment of the juvenile court.

**BACKGROUND**

Jasmine was first placed in foster care in February 2006 after Ms. N. was found to be intoxicated and unable to care for Jasmine. In July 2006, Jasmine was returned to Ms. N.'s care, but was then removed from October 2006 until January 2007 when Ms. N. "relapsed on alcohol." From February to May 2008, Jasmine was placed in foster care for a third time,

again due to Ms. N.'s problems with alcohol. Her most recent removal from Ms. N.'s custody began on November 4, 2009.

On the morning of November 4, 2009, Mr. L., Ms. N.'s live-in boyfriend, arrived at Jasmine's elementary school to discuss an incident that had occurred previously between Jasmine and another child. Because Mr. L. was not Jasmine's parent, the school would not speak with him about Jasmine. Mr. L.'s visit, however, prompted the school principal, Nancy Thompson, to review Jasmine's enrollment folder, where she discovered that Ms. N. had not provided all of the necessary documents for Jasmine when she was enrolled. School personnel then called Ms. N. to ask for the missing documents. Ms. N. responded to the phone call by yelling that she did not want Jasmine to be taken away from her.

Sometime after the phone call, Ms. N. arrived at Jasmine's elementary school and demanded to remove Jasmine from her class, reiterating Mr. L.'s complaint about the school's handling of the issue between Jasmine and another student. Ms. N. was intoxicated, and Thompson noted that the odor of alcohol coming from Ms. N. was "overwhelming." She also had visible injuries on her face that Ms. N. admitted were the result of a domestic dispute with Mr. L. that had occurred earlier that day. Ms. N.'s intoxication and her injuries prompted school personnel to call the police.

When the police arrived, the officers indicated that they had responded to another domestic violence issue at Ms. N.'s home the previous weekend. Bobby Feher, a Child Protective Services Investigator, also arrived at the school with her supervisor. Feher

2

observed that Ms. N. "clearly smelled of alcohol," had mud on her jacket, had a bruise and laceration on her face, and was "emotionally augmented throughout the contact with her and her emotions vacillated from crying hysterically, to being belligerent with the officers by calling them ass holes . . . [and calling] my supervisor a bitch." Ms. N. denied drinking alcohol, but admitted that she had taken oxycontin or oxycodone that day for a dental issue. She refused a breathalyzer when offered.

Feher told Ms. N. that Ms. N.'s behavior raised concerns about Jasmine's safety, and asked if Ms N. could help devise an alternative plan for Jasmine's care. Ms. N. "became extremely belligerent" at that point, and refused to enter into a safety plan. Because Ms. N. refused to create a safety plan, Feher removed Jasmine from Ms. N.'s care that day, placed the child in a foster home, and filed a shelter care petition.

A shelter care hearing took place the following day. Prior to the hearing, Ms. N. called Feher stating that she could not attend the hearing because she had to go to work. She told Feher that she wanted her daughter back, and admitted to consuming alcohol the previous day. Ms. N., however, was seen near Jasmine's school at the time of the shelter care hearing, when she had told Feher that she would be at work. At the conclusion of the hearing, the juvenile court ordered that Jasmine remain in foster care.

On November 16, 2009, Feher visited Ms. N.'s home for a prescheduled visit. She found nothing of concern about the home environment, but noted that Ms. N. again admitted that she had been drinking on the day Jasmine was removed from Ms. N.'s care, and admitted

3

that she had continued to use alcohol and live with Mr. L. Ms N. also stated that she had initiated alcohol services in the past, but made excuses for not successfully completing them. Feher offered the Department's services with regard to a substance abuse assessment and toxicology screen, but Ms. N. refused Feher's help.

Around the time of the shelter care hearing, Ms. N. called the Department stating that she did not want to have visitation with Jasmine because she was embarrassed by the injuries inflicted on her by Mr. L. and did not want Jasmine to see her. On November 19, 2009, Ms. N. called the Department to say that she was still not comfortable visiting Jasmine, noting that Mr. L. was "giving her a hard time." By this time, Ms. N. had already canceled multiple visits with Jasmine. She left additional messages with the Department the following two days, the first day stating that she loved Jasmine but wanted to give her up for adoption because she was tired of fighting, but the second day asserting that Feher "was not going to be specifying anything about her daughter, [and] that she [was] going to sue the County." Feher believed Ms. N. had been drinking on the second day.

On December 2, 2009, a master recommended that Jasmine be adjudicated CINA and placed in the care and custody of the Department. The juvenile court accepted the master's recommendations and also ordered Ms. N. to complete a substance abuse assessment, a domestic violence assessment, and a mental health assessment, and to participate in recommended treatment.

After the CINA adjudication, on January 11, 2010, Ms. N. began meeting with a

psychiatrist, Dr. Daniel D. Storch. On February 24, 2010, Dr. Storch was called to the Howard County General Hospital after Ms. N. threatened to commit suicide. Dr. Storch learned that Ms. N. had a blood alcohol level of .329 and had tested positive for marijuana.

On February 25, 2010, Cheryl Lawson-Anderson, Ms. N.'s social worker at the Department, called Dr. Storch to inform him that she had received at least five to six voice-mails from Ms. N. saying that she was going to commit suicide. Dr. Storch met with Ms. N. later that day, and she explained that she had been having a bad week, but that she "got [her] medicine [and] feel[s] 80% better." Ms. N. stated that she had called the school in addition to Lawson-Anderson to say that she missed her daughter and admitted that she "might have said" she was going to hurt herself. Ms. N. told Dr. Storch that she would not hurt herself, however, and that she would go to counseling and start back in Alcoholics Anonymous ("AA").

Dr. Storch completed a psychiatric evaluation for Ms. N. based on their two meetings on January 11 and February 25, 2010, and diagnosed her with mood disorder and alcohol dependence. Dr. Storch recommended that Ms. N. continue substance abuse treatment and domestic violence counseling, that she attend ninety AA meetings in ninety days, and that she receive psychiatric treatment.

On March 2, 2010, Ms. N. entered into a service agreement with the Department, and agreed to maintain contact with Jasmine, complete a psychiatric evaluation, submit to a drug and alcohol evaluation, submit to a domestic violence assessment, provide Jasmine financial

5

support, and provide proof of employment. The Department agreed to arrange regular visits between Jasmine and Ms. N., and to refer Ms. N. to appropriate resources and supportive services. Ms. N. completed the drug and alcohol evaluation, the domestic violence assessment, and had previously completed the psychiatric evaluation through Dr. Storch.

On January 5, 2011, Ms. N. and the Department entered into a second service agreement to ensure that Ms. N. was continuing in therapy and complying with Department recommendations. Ms. N. agreed to continue treatment for alcohol abuse, submit to random drug and alcohol testing, attend domestic violence counseling, and continue to see her psychiatrist and follow all treatment recommendations including participating in AA meetings.

Ms. N. partially complied with the requirements of the second service agreement. She met with her therapist, Lana Fink, a clinical social worker at the Howard County Health Department, but missed many of the appointments. Between July 2010 and October 2012, Scott Alpert, a licensed clinical professional counselor and certified chemical dependency counselor, conducted random drug screening for Ms. N. Ms. N. had nine positive tests for alcohol and refused to take a random test approximately thirty times.[1] Alpert had to temporarily suspend services four times due to her refusal to submit to drug testing.

Ms. N. participated in some AA meetings, but complained that the meetings depressed her and made her want to drink. She attended domestic violence classes, but continued her

---

[1] Refusal to take a test is considered a presumptive positive result.

6

relationship with Mr. L. The Department arranged for Ms. N. to enter inpatient treatment for alcohol dependence four times, but Ms. N. refused each offer, stating that she did not drink. The service agreement also allowed Ms. N. to have supervised visitation with Jasmine once a week for two hours. Ms. N. missed forty-five of those scheduled visits.

From about the time of Ms. N.'s first service agreement with the Department, Jasmine also had been meeting with a therapist. Bertha Carrelli, a clinical social worker and psychotherapist at A Healing Place, met with Jasmine bi-weekly through the date of the TPR hearing on August 28, 2013. From June to September 2011, Carrelli also held family therapy sessions with Ms. N. and Jasmine.

On October 19, 2011, Alpert performed a comprehensive substance abuse assessment of Ms. N. at the request of Lawson-Anderson. Based on his evaluation, Alpert recommended that Ms. N. attend a minimum of twenty-eight days at a residential drug and alcohol treatment facility followed by intensive outpatient treatment for three months. Alpert arranged for Ms. N. to be admitted to an inpatient center, but Ms. N. refused to complete the center's phone intake, making her ineligible for admission. She also stated she did not need inpatient therapy, because she does not drink. Around this time, the juvenile court ordered Ms. N. to enter inpatient treatment for her alcohol dependency and suspended supervised visits between Ms. N. and Jasmine until Ms. N. complied with the order. Ms. N. never entered inpatient treatment.

Despite Ms. N.'s failure to comply with the court's order to attend inpatient treatment,

in December 2011, the juvenile court again allowed Ms. N. to have supervised visitation with Jasmine. Family therapy sessions had ceased when Ms. N.'s visitation rights were suspended, but in May 2012, the Department requested that family therapy resume. Jasmine, however, did not want family sessions to begin again, because she worried that Ms. N. would be angry if they talked about Jasmine's feelings. As a result, the Department did not require family sessions to resume.

On August 22, 2012, Jasmine began living with her current foster parents. Shortly thereafter, Jasmine asked that family therapy sessions with Ms. N. resume, and on September 28, 2012, Jasmine and Ms. N. met with Carrelli. At the session, Jasmine expressed how she felt when Ms. N. was drinking, saying that she felt sad, lonely, and scared. Ms. N. denied having been intoxicated in front of Jasmine. Family sessions were again suspended after Jasmine subsequently requested that they be stopped.

On December 6, 2012, the juvenile court ordered a change in Jasmine's Permanency Plan from reunification with Ms. N. to adoption by her foster family. On December 26, 2012, the juvenile court again suspended Ms. N.'s supervised visitation with Jasmine until Ms. N. provided documentation to the court that she was receiving mental health treatment. Ms. N. never submitted such documentation, and thus has not seen Jasmine since December of 2012.

On March 18, 2013, the Department filed a TPR petition in the juvenile court. Ms. N. filed a Notice of Objection to the TPR petition on April 8, 2013, which stated, "I am a

very good mother and I don't drink. I want my daughter back." The TPR trial was conducted on August 28 and 29, 2013. Jasmine, through counsel, supported termination of Ms. N.'s parental rights. Ms. N. was not present at either day of the trial.

Feher testified on behalf of the Department, and stated that Ms. N. sometimes called Department multiple times in a day, leaving messages that became increasingly erratic as the day progressed, leading Feher to suspect that Ms. N. had been drinking. In the messages, Ms. N. would state that she loved her daughter and could not live without her, then state that Jasmine should be taken away from her, and finally pronounce that she was going to kill herself. Feher testified that alcohol use, denial of alcohol as an issue, and domestic violence were consistent factors in Ms. N.'s history with the Department.

Lawson-Anderson also testified on behalf of the Department, corroborating Feher's testimony that when Ms. N. drinks, she would call the Department and leave disturbing and offensive phone messages. She stated that the primary barrier to Jasmine's reunification with Ms. N. was Ms. N.'s drinking problem and her denial of drinking as an issue.

Carrelli was accepted as an expert in the field of clinical social work and testified on behalf of the Department. She stated that it took Jasmine some time to open up, but that Jasmine eventually expressed sadness about being in foster care, and sadness and disappointment about Ms. N.'s missing supervised visits. Jasmine also told Carrelli that she was concerned about being reunited with Ms. N., because Ms. N. had told Jasmine that they would leave Maryland once Jasmine was returned to her, and she did not like Ms. N. and Mr.

L. fighting. By the end of 2012, Carrelli testified that Jasmine expressed her desire to be adopted by her current foster family, but that she may want to see Ms. N. again in the future.

Fink was accepted by the court as an expert licensed clinical social worker, and testified on behalf of Ms. N. Fink testified that Ms. N. never developed insight into the issues that required her to attend counseling. She stated that, although Ms. N. "came [to appointments] on a regular basis for a considerable amount of time," Ms. N.'s attendance at therapy became less consistent as time progressed.

Paula S. ("Ms. S."), one of Jasmine's foster parents, also testified at the hearing, and stated that Jasmine was doing well living in her home. Ms. S. stated that, since moving to her current foster home, Jasmine has received A's in school, developed friendships with her peers, and bonded with her foster parents and their extended families. She stated that she and her partner would adopt Jasmine if it became an option.

At the end of the trial, the juvenile court issued an oral order terminating Ms. N.'s parental rights.[2] The order terminating Ms. N.'s parental rights was entered on August 30, 2013, and Ms. N. noted a timely appeal on September 18, 2013.

### THE JUVENILE COURT'S DECISION

The juvenile court gave a detailed summary of the testimony it found credible, and then considered each of the required statutory factors for TPR proceedings under Maryland

---

[2] Jasmine's father, who is unknown, was deemed to have consented to termination of his parental rights after the Department was unable to find him.

10

Code (1984, 2012 Repl. Vol.), § 5-323(d) of the Family Law Article ("FL"). The court specifically determined that, "by clear and convincing evidence [ ] the facts have demonstrated an unfitness of Ms. N[.] to remain in a parental relationship with her child . . . ." The court cited Feher's testimony concerning the events of November 4, 2009 when Ms. N. arrived at Jasmine's elementary school intoxicated, belligerent, and visibly injured from a recent domestic dispute. The court discussed Ms. N.'s multiple failures and refusals of tests for alcohol use, her inappropriate phone calls to the Department made when intoxicated, in which she threatened to hurt herself and others, and the fact that Ms. N. was "never able to be sober enough to have unsupervised visits with Jasmine and that's during the entire time that she's [been] in [foster] care from 2006." In addition, the court considered Ms. N.'s consistent failure to begin or complete recommended and required treatment for her alcohol dependency, despite the Department's multiple attempts to facilitate such treatment. Carrelli's testimony was cited as evidence that Jasmine was apprehensive about reuniting with her mother, and the court noted that Ms. N.'s own witness, Fink, stated that Ms. N.'s prognosis for improvement was not good, because Ms. N. refused to accept that she had a problem with alcohol.

After setting forth the above testimony supporting Ms. N.'s unfitness as a parent, the juvenile court methodically discussed each factor under FL § 5-323(d). We present a summary of the court's analysis, findings, and conclusions below.

11

**FL § 5-323(d)(1)(i)—Services offered to the parent before the child's placement**

The trial court offered a history of the Department's role in Jasmine and Ms. N.'s life, noting that Jasmine had been placed in foster care three times prior to her most recent removal from Ms. N.'s home in 2009. Each of Jasmine's removals was due to Ms. N.'s intoxication and consequent inability to take care of Jasmine. Each time the Department placed Jasmine in foster care, Ms. N. was offered services including, at various times, mental health counseling, a detoxification program, random urinalysis testing, and a substance abuse assessment. The trial court found "by clear and convincing evidence that under the circumstances, the Department's attempts at addressing the mother's problem at its inception and prior to coming into care were appropriate."

**FL § 5-323(d)(1)(ii)—The extent, nature, and timeliness of services offered to facilitate reunion of the parent and child**

In consideration of the extent, nature, and timeliness of services offered to Ms. N. to help her work toward reunification with Jasmine, the trial court stated:

> There was Health Department treatment, resources provided, [Ms. N.] was given [a] list of resources, there was four requests for in-patient, the funds were expended for taxis for visitation services, for alcohol services, substance abuse testing, psychiatric evaluations, psychological evaluations. **Despite all of these resources, there's been no progress or no significant progress by the mother.**
>
> She's had periods of sobriety and other periods of not complying with treatment. **At one point, the Court also stopped visitation in December of 2012 until there was an engagement into treatment and Ms. N. still, to this day, has not taken advantage of that.** So there's been many, many resources expended by the local department in order to facilitate reunification.

12

(Emphasis added).

**FL § 5-323(d)(1)(iii)—The extent to which the Department and parent fulfilled their obligations under the social services agreement**

Ms. N. signed two service agreements with the Department during the time Jasmine was most recently placed in foster care, from November 2009 to August 2013. The trial court found that the Department had fulfilled its obligations listed in the service agreements by providing referrals for doctors and treatment programs, and providing various assessments and testing. Ms. N. was credited with partially fulfilling her obligations, the court noting that "she did, in fact, submit to either the substance abuse assessment, the mental health evaluations[,] but she has not complied with her obligations in attending treatment in an attempt to remain sober."

**FL § 5-323(d)(2)—The parent's effort to adjust her circumstances, condition or conduct to make it in the child's best interest to be returned to the parent's home**

The juvenile court determined that Ms. N. had not made an effort to adjust her behavior or her circumstances in a manner that would allow Jasmine to return home, and observed that Ms. N.'s recent contact with her daughter had been very limited. The court concluded that Ms. N. "has really made no effort at all to adjust her circumstances in order to facilitate or to make reunification possible or [ ] in the child's best interest."

**FL § 5-323(d)(2)(i)—The parent's regular contact with the child, the Department, and the child's caregiver**

The court noted that Jasmine and Ms. N. have not been in regular contact since Jasmine was removed in November 2009, and that in the eight months preceding the TPR

13

hearing, there was no contact between parent and child. Although Ms. N. kept in contact with the Department, much of that contact was inappropriate. The juvenile court pointed out that there was a connection between Ms. N.'s consumption of alcohol and her inappropriate contact with the Department, specifically noting that there were "at least ninety-six inappropriate calls/contact by phone with the Department." The court attributed Ms. N.'s limited contact with Jasmine and Jasmine's foster parents to Ms. N.'s "inappropriate behavior and derogatory comments."

**FL § 5-323(d)(2)(ii)—The parent's financial contribution to the child, if the parent is able**

The juvenile court described Ms. N. as being unable to maintain stable employment. Consequently, the court determined that Ms. N. was unable to financially contribute to Jasmine's care.

**FL § 5-323(d)(2)(iii)—The existence of a parental disability that would make it difficult to care for the child's needs for long periods of time**

Initially noting that it remained a question of whether Ms. N.'s abuse of alcohol was a disability, the juvenile court nonetheless found "by clear and convincing evidence that [Ms. N.'s] alcohol dependency and her denial of having an alcohol problem, her inconsistent attempts at treatment, her inability to remain sober for any long period of time does, in fact, make it difficult or impossible for her to care for the child's immediate and ongoing psychological needs."

**FL § 5-323(d)(2)(iv)—Whether additional services would result in lasting parental change so that the child could be returned**

The juvenile court noted that a parent is generally allowed eighteen months to make lasting changes, and in this case Jasmine had been in the Department's care "way beyond the eighteen months." Because over three years had passed since the date of Jasmine's most recent removal from Ms. N.'s home and placement into the Department's care, and services offered to Ms. N. had not yet been successful in achieving reunification, the juvenile court concluded that additional services would not alter Ms. N.'s ability to care for Jasmine.

**FL § 5-323(d)(3)(i)–(v)—Whether the parent has abused or neglected the child, the seriousness of that abuse or neglect, the parent's use of drugs, the parent's previous convictions for violent crimes, and the parent's previous loss of parental rights**

The juvenile court stated that these factors were not applicable to the present case. Previously in its oral opinion, however, the trial court noted that Ms. N. had been indicated for neglect based on Ms. N. chronically exposing Jasmine to alcohol and domestic violence, and Ms. N.'s denial of her substance abuse issues.

**FL § 5-323(d)(4)(i)—The child's emotional ties with her parent, siblings, and others who may significantly affect the child's best interest**

The juvenile court acknowledged Jasmine's tie to and love for Ms. N., stating that "based on the history from 2006, [ ] one of the reasons why [the Department] kept attempting reunification or returning the child is because of the child's bond with [Ms. N.]." Despite this bond, the court described a change in Jasmine's opinion based on the events of the past

15

six to seven years, and noted that she now prefers to be adopted.[3]

**FL § 5-323(d)(4)(ii)—The child's adjustment to the community, home, placement, and school**

The juvenile court referenced the testimony of Jasmine's foster parent, Ms. S., who stated that, although Jasmine had some behavioral issues at first, she had adjusted well to her new home. Ms. S. described Jasmine as receiving straight A's for the past two semesters in school, and noted that the child participated in family events including a wedding and Thanksgiving celebration. Jasmine was involved in a variety of activities including dance, singing, swimming, and drama. The court determined that Jasmine is bonded with her foster family, and that it "is clearly an appropriate placement."

**FL § 5-323(d)(4)(iii)—The child's feelings about ending the parent/child relationship**

Because Jasmine told Carrelli and her foster parents that she wants to be adopted, the juvenile court concluded that Jasmine wants to end the parent/child relationship.

**FL § 5-323(d)(iv)—The likely impact of terminating parental rights on the child's well-being**

The juvenile court stated that, based on all of the evidence presented, it did not think there would be any harmful or detrimental impact on Jasmine by terminating Ms. N.'s parental rights.

---

[3] Although Jasmine has siblings, she has seen them only once. At the TPR hearing, Ms. S. acknowledged that Jasmine has expressed some desire to see her brothers and her mother, and stated that she was open to the possibility of Jasmine having a continued relationship with her biological family if it was safe for her to do so.

Based upon its consideration of all the above statutory factors and the testimony and evidence presented at the trial, the juvenile court terminated Ms. N.'s parental rights.

## DISCUSSION

In reviewing a juvenile court's decision to terminate parental rights, we apply three different levels of review:

> "Namely, [w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8-131(c) ] applies. [Second,] [i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion."

*In re Adriana T.*, 208 Md. App. 545, 553-54 (2012) (alterations in original) (footnote omitted) (quoting *In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 100 (2010)). In reviewing whether the juvenile court abused its discretion in its ultimate decision to terminate parental rights, we are mindful that, "'to be reversed the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *In re Shirley B.*, 419 Md. 1, 19 (2011) (quoting *In re Yve S.*, 373 Md. 551, 583-84 (2003)).

Parents have a "[c]onstitutionally-based right to raise their children free from undue and unwarranted interference on the part of the State, including its courts." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 495 (2007). This right creates "a

17

presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents." *Id.* That presumption, however, has limits, and the right of a parent to make decisions regarding the care, custody, and control of their children may be taken away where (1) the parent is deemed unfit, or extraordinary circumstances exist that would make a continued relationship between parent and child detrimental to the child, and (2) the child's best interests would be served by ending the parental relationship. *Id.; see id.* at 496 ("[O]ur case law has been clear and consistent, that, even in contested adoption and TPR cases . . . , where the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard."); FL § 5-323(b) (requiring the court to determine unfitness or extraordinary circumstances by clear and convincing evidence). In determining the child's best interests, the juvenile court is required to consider the statutory factors in FL § 5-323(d). *In re Adoption of Jayden G.*, 433 Md. 50, 94 (2013) ("A finding of parental unfitness overcomes the parental presumption, but it does not establish that termination of parental rights is in the child's best interest. To decide whether it is, the court must still consider the statutory factors under FL § 5-323(d).").

In the instant case, Ms. N. does not challenge the juvenile court's factual findings or analysis of the statutory factors under FL § 5-323(d). Instead, Ms. N. argues that (1) the evidence did not support a finding that maintaining a parental relationship with Jasmine would be detrimental to the child, (2) Ms. N. and Jasmine had a strong parent-child bond, (3)

18

parents are not expected to be perfect and Ms. N.'s parenting was not as bad as it could have been, and (4) there was no evidence that severing Ms. N.'s ties to Jasmine would be in Jasmine's best interests. We will address each of Ms. N.'s contentions in turn.

First, Ms. N. argues that the evidence did not demonstrate that continuing her parental relationship with Jasmine would be detrimental to Jasmine, and that exceptional circumstances did not exist to justify termination of her parental rights. For support, Ms. N. cites to *In re Adoption/Guardianship of Alonza D., Jr.*, 412 Md. 442 (2010), arguing that the length of time a child has been in foster care is "insufficient to satisfy a determination of exceptional circumstances, absent any finding that a continued relationship with [the child] would be detrimental to them." The juvenile court, however, did not determine that exceptional circumstances existed; rather it concluded that Ms. N. was an unfit parent.

Pursuant to FL § 5-323(b), before terminating a biological parent's rights, the juvenile court is required to find, by clear and convincing evidence, that (1) "a parent is unfit to remain in a parental relationship with the child" *or* (2) "that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests . . . ." If the court determines, therefore, that *exceptional circumstances* exist, only then must it link those circumstances to the continuation of the parental relationship being detrimental to the best interests of the child. *See id.; see also In re Adoption/Guardianship of Darjal C.*, 191 Md. App. 505, 531-32, *cert. denied*, 415 Md. 42 (2010). If the court determines that the

19

parent is *unfit* to remain in a parental relationship with the child, however, then the continued parental relationship is, in our view, by definition detrimental to the child, and there need not be an express finding to that effect before terminating parental rights. *See* FL § 5-323(b). Because in the instant case the juvenile court determined that Ms. N. was unfit, Ms. N.'s arguments regarding exceptional circumstances are beside the point.

Second, Ms. N. contends that the bond between Jasmine and her mother was very strong, and that Ms. N. never gave up on reunification with her daughter. We have previously stated that FL § 5-323(d) "does not require a trial court to weigh any one statutory factor above all others. Rather, the court must review all relevant factors and consider them together." *In re Adoption/Guardianship No. 94339058/CAD*, 120 Md. App. 88, 105 (1998). In the instant case, the juvenile court acknowledged Jasmine's bond with her mother, but decided that it was not sufficient to overcome the negative aspects of Ms. N.'s parenting abilities that make it in Jasmine's best interests to terminate the parental relationship. Ms. N.'s alcoholism, her unwillingness to accept her alcoholism or receive treatment, and her abusive relationship with Mr. L. contributed to this decision. In addition, the court noted that Jasmine's bond with her mother had changed over the years that she was in foster care, and that now Jasmine wants to be adopted. Thus Ms. N.'s argument that she and Jasmine share a strong bond does not convince us that the trial court should have concluded Ms. N. was a fit parent, in light of the other evidence adduced at the TPR hearing.

Next, Ms. N. argues that, "even though the [Department] demonstrated that [Ms. N.]

20

has not successfully achieved sobriety it did not demonstrate that she was unworthy of having at least a legal relationship with her child." Ms. N. points out that she never physically injured Jasmine, that Jasmine did not have significant absences at school, and that Jasmine was never subject to chronic abuse, chronic or life-threatening neglect, or sexual abuse or torture. Ms. N. also argues that her alcoholism was insufficient alone to justify terminating her parental rights without proving that she was unable or unwilling to provide for Jasmine.

Again, Ms. N. overlooks the fact that the court must weigh all of the statutory factors together, without presumptively giving one factor more weight than another. *Id.* Indeed, although the juvenile court must consider every factor in FL § 5-323(d), it is not necessary that every factor apply, or even be found, in every case. *See In re Adoption No. 2428*, 81 Md. App. 133, 139 n.1 (1989). Instead, as noted above, the court must find under FL § 5-323(b) that *either* the parent is unfit to remain in a parental relationship with the child, *or* exceptional circumstances exist that would make a continuing parental relationship detrimental to the child, and then fuse such finding with a determination as to the best interests of the child using the applicable factors under FL § 5-323(d), before concluding that the termination of the rights of a parent is in the child's best interests. *See* FL § 5-323(b); *In re Jayden G.*, 433 Md. at 96 n.32 (noting that the concepts of parental unfitness, exceptional circumstances, and the child's best interests "are fused together, culminating in the ultimate conclusion of whether terminating parental rights is in a given child's best interests").

Here, it was not solely Ms. N.'s reliance on alcohol that caused the juvenile court to terminate her parental rights, but rather Ms. N.'s behavior while she was using alcohol, her refusal to seek and accept treatment for her alcohol dependency, her failure to acknowledge her use of alcohol as a problem, and the consequent effect of the above on her ability to raise Jasmine, including her failure to remain in contact with her daughter. Although Ms. N. did not subject Jasmine to any serious injury, the juvenile court was provided ample evidence of Ms. N.'s inability to be a parent to Jasmine and thus could conclude that Ms. N. was unfit and Jasmine's best interests would be served by terminating Ms. N.'s parental rights.

Finally, Ms. N. argues that "there was no evidence that severing Jasmine's ties to her natural mother was in her best interests." Although the juvenile court made a determination as to the unfitness of Ms. N. as Jasmine's parent, it did not explicitly state that a termination of Ms. N.'s parental rights would be in Jasmine's best interest in either its oral opinion or written order.[4] This Court has previously stated, however, that a juvenile court in making a TPR determination "is not required to recite the magic words of a legal test," and that "'mere incantation of the "magic words" of a legal test, as an adherence to form over substance, may not cause the Genie to appear and is neither required nor desired if actual consideration of the necessary legal considerations are apparent in the record.'" *In re Adoption/Guardianship of Darjal C.*, 191 Md. App. at 532 (quoting *S. Easton Neighborhood Ass'n v. Town of*

---

[4] At the beginning of its oral opinion, the juvenile court did state that "the Court has to review this [case] under [FL §] 5-323(b) [] standard, as I said, as clear and convincing evidence that terminating the parental rights of [Ms.] N. is in Jasmine's best interest."

*Easton*, 387 Md. 468, 495 (2005)). In the case *sub judice*, the facts adduced in the juvenile court and language of the court's oral decision make clear that the court determined that Jasmine's best interests would be served by ending Ms. N.'s parental rights.

The juvenile court cited to Ms. N.'s threats to hurt herself and others, and Jasmine's concern about her mother's safety as a result. The court discussed Ms. N. being indicated for neglect based on her "denial and/or minimization of the issues concerning substance abuse and chronically exposing the child to the mother's alcohol and all this domestic violence." The court also referenced Fink's testimony that Ms. N. had not accepted her alcohol dependency and that her "prognosis is not good unless she is able to have insight" into those issues. The court observed that Ms. N. had "never been able to be sober enough to have unsupervised visits with Jasmine and that's during the entire time that she's [been] in the care from 2006."

In addition, the juvenile court pointed to Ms. N.'s unwillingness to comply with court orders such that she did not visit with Jasmine for eight months prior to the TPR trial. The court cited to Ms. N.'s initial embarrassment and refusal to see Jasmine due to her injuries, noting that the missed visits caused Jasmine emotional turmoil for years while she was in foster care. The court also discussed how Jasmine's development began to flourish in the period that Ms. N. could not see her child. Jasmine's previous behavioral issues subsided, and she began to perform well academically while being integrated into her extended foster family. The court noted that Jasmine eventually decided that she would rather be adopted

by her foster parents than continue a relationship with Ms. N.

The juvenile court's decision was based on ample evidence that it would be in Jasmine's best interest to terminate Ms. N.'s parental rights. This, in addition to the court's finding that Ms. N. was an unfit parent, fully supported the grant of the TPR petition. We find no error or abuse of discretion in the court's decision.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**