REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 2816
September Term, 2015

_____


IN RE: ADOPTION/GUARDIANSHIP OF

L.B. AND I.L.

_____


Graeff,
Friedman,
Eyler, James R.
 (Retired, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed: September 1, 2016

K.H., appellant, challenges an order issued by the Circuit Court for Harford County terminating her parental rights ("TPR") to her two sons, L.B. and I.L.[1]  Ms. H. presents three questions for our review:

1. Where the mother had another child in her custody, did the court err by terminating parental rights, where the court failed to make and articulate a finding about parental unfitness or exceptional circumstances prior to determining what was in the subject children's best interests?

2. Did the court err by failing to place the children in the care of relatives rather than granting guardianship to the Department of Social Services?

3. Did the court err in terminating parental rights where the mother had remedied the problems leading to the removal of her children from her care, and the problems were typical not exceptional?

For the reasons set forth below, we shall affirm judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Initiation of the Department of Social Services' Interest in L.B.*

The Harford County Department of Social Services ("DSS" or the "Department"), an appellee, took interest in L.B. at the time of his birth, when it received information that Ms. H. was using Percocet during her pregnancy.  That allegation of neglect ultimately was ruled "unsubstantiated" by DSS, but due to concerns about Ms. H.'s mental health and substance abuse, a DSS caseworker instituted a "Safety Plan," which required that Ms. H.

---

[1] L.B. was born in February 2011, and I.L. was born in September 2013.  The children's fathers did not appeal and are not part of these proceedings.

not be left alone with her children.[2]  DSS subsequently transferred the case to the Continuing Services department so further services could be provided to the family.

In March 2011, Bethany Fisher, a DSS Child Protective Services caseworker assigned to L.B.'s case, had L.B.'s parents sign a new Safety Plan.  Ms. Fisher was concerned about Ms. H.'s mental health because Ms. H. was diagnosed with bipolar disorder, but she was not receiving treatment or taking her medication.  Ms. Fisher also was concerned about Ms. H.'s "continuing use of drugs."  Accordingly, the terms of the March 24, 2011, Safety Plan required that Ms. H. continue her mental health treatment and submit to substance abuse evaluation and urinalysis.

Ms. H. partially complied with the March 2011 Safety Plan.  She "did get back into mental health treatment," but "she was not consistent[ly] going to her counseling sessions."  Ms. H. completed substance abuse evaluation, and she submitted to random urinalysis.  Ms. Fisher referred Ms. H. to various providers of mental health services, substance abuse services, infant and toddler resources, housing resources, and food assistance, but Ms. H. only "complied with some of them."

In April 2011, Ms. Fisher implemented a "Service Plan," which "identifie[d] the tasks [DSS was] asking the family to do long term."  The terms of the April 2011 Service Plan were similar to those of the March 2011 Safety Plan.  As before, Ms. H. only partially complied with the plan.

---

[2] A Safety Plan is put in place when there are safety concerns in the home.

By June 9, 2011, Ms. H. was "making progress," so she and Ms. Fisher executed a new Safety Plan that permitted Ms. H. to be alone with her children. In June 2011, DSS received a new report indicating that Ms. H. was not properly supervising her older child, S.M.[3] Accordingly, Ms. Fisher updated the Safety Plan to require that Ms. H. "appropriately supervise the children at all times."

At some point between August and September 2011, Ms. H. and her children were evicted from their home. Ms. H. stayed with friends and family until she could find permanent housing. During that period of time, there were some "domestic violence issues going on," and in August 2011, Ms. H. filed for a protective order against L.B.'s father, Mr. B.

### *DSS Places L.B. in Foster Care*

On October 3, 2011, Ms. Fisher contacted Ms. H.'s mother, J.H., who informed her that, on the previous evening, Ms. H. and Mr. B. had come to her apartment in an intoxicated state. Ms. Fisher subsequently had difficulty contacting Ms. H. When she called on October 6, 2011, Mr. B. answered Ms. H.'s phone, even though there was an active protective order prohibiting him from being in contact with Ms. H. Ms. Fisher went to Mr. B.'s mother's house and found L.B., who was "very dirty" and had "red bumps or a rash on his forehead." Ms. H.'s family told Ms. Fisher that Ms. H. had "shown up" the night before with a bottle of alcohol in her purse, and she appeared to be intoxicated.

---

[3] S.M. was not a subject of the TPR proceedings below.

Ms. Fisher then "issued shelter care papers," removed L.B. from Ms. H.'s care, and placed him in foster care.[4] She later testified that L.B. was removed because Ms. H. "was not being compliant with her mental health treatment. There were numerous concerns being reported to the department about her alcohol abuse. The family did not have stable housing. [And L.B.] had not been taken to the pediatrician in several months."

L.B.'s foster parent later testified that, when L.B. was first placed with her, he was behind on his immunizations, was experiencing difficulty sleeping, and had a red rash on his face and a staph infection "around his diaper area." She testified that her experience with Ms. H. had been unpleasant and confrontational. At one point, she filed for a Peace Order after Ms. H. posted "threatening remarks" on Facebook.

On October 7, 2011, Ms. Fisher petitioned the circuit court to designate L.B. a Child in Need of Assistance ("CINA").[5] On October 26, 2011, the court found that DSS's allegations were substantiated and designated L.B. a CINA.

At some point after L.B. was placed in foster care, Ms. H.'s mother, J.H., offered to be "a resource" for him. Ms. Fisher conducted a "home study," but she did not approve

---

[4] On that same date, October 6, 2011, the DSS caseworker also implemented a Safety Plan with Ms. H.'s mother, placing Ms. H.'s older child, S.M., into her care. S.M.'s case was closed in February 2012 with the understanding that Ms. H. and her mother would have joint custody of him, and he would continue to live with his grandmother.

[5] A "child in need of assistance" ("CINA") is one who requires court intervention because the child has been abused or neglected, or has a developmental disability or mental disorder; and his or her "parents/guardian, or custodian are either unable or unwilling to give proper care and attention to the child and the child's needs." Md. Code (2015 Supp.) § 3-801(f) of the Courts and Judicial Proceedings Article.

her request to care for L.B. because J.H. was already caring for Ms. H.'s other child, and Ms. Fisher was concerned about J.H.'s ability to care for both at the same time. Another DSS worker who participated in the evaluation testified that they had further concerns that J.H. had mental health issues of her own, that she tried to cover up Ms. H.'s mental health issues, and she was not "going to be able to work with the department and be honest about the relationship that she had with [Ms. H]."

Ms. Fisher continued working with Ms. H. after L.B. was removed from her care. Although Ms. H. attended weekly visits with L.B., Ms. Fisher noted that Ms. H. "was not making very much progress regarding her housing situation" or "doing very much regarding trying to get things together for [L.B.] to be able to come back home to her." Ms. H. submitted to random urinalysis and tested negative each time, but she failed to attend her mental health sessions.

On October 7, 2011, Ms. Fisher transferred L.B.'s case to Renee Little in the DSS foster care in-take unit.[6] Ms. Little supervised biweekly visits, noting that, "for the most part," Ms. H. was attentive and appropriate around L.B.

In November 2011, Ms. H. obtained Section 8 housing with the assistance of DSS. DSS conducted a home inspection and deemed the home appropriate for L.B.

---

[6] Directly after children are removed from a home by the Harford County DSS, their cases typically are assigned to a foster care in-take worker for approximately two to four months. It is the in-take worker's role to "get everything . . . set up and managed." If the child remains in foster care beyond that time, the case is then transferred to a foster care continuing worker for long-term management.

On November 15, 2011, a psychologist conducted a psychological evaluation of Ms. H. The psychologist testified that Ms. H. was a particularly difficult client to interview, and he had concerns about her credibility. He diagnosed Ms. H. "as having Bipolar One Disorder," although he noted this diagnosis was "tentative" because she denied "any history of symptoms that would be consistent." He also diagnosed Ms. H. as having "poly substance abuse" and "a personality disorder with histrionic and anti-social features." The psychologist testified that he was concerned that, "without treatment, her prognosis was very poor."

On December 6, 2011, Ms. H. signed a Service Agreement requiring that she maintain stable and safe housing, secure employment, submit to random urinalysis, and submit to psychological evaluation and mental health counseling. Ms. H.'s compliance was tenuous at first, but it subsequently improved. At the time Ms. Little received L.B.'s case, Ms. H. was receiving mental health treatment from "Alliance," but in December 2011, Ms. H. was "discharged" from the facility "due to non compliance."[7] Ms. H. then unsuccessfully sought treatment from "Upper Bay," who she claimed did not return her phone calls. On January 4, 2012, Ms. H. began receiving treatment from "Community Behavioral Services," and she was "actively participating in counseling" during the time Ms. Little had the case. Both Ms. H. and L.B.'s father completed a seven-week parenting

---

[7] Renee Little testified that DSS provided transportation to Ms. H. as long as she timely requested it. Even if the request came late, DSS would "try to accommodate" her, and therefore, if Ms. H. "missed an appointment, it wasn't because [DSS] didn't help her get there."

skills course. Ms. H. "participated sporadically with Alpha's Glory to get some additional support." She also submitted to random urinalysis as required.

By February 2012, Ms. H.'s compliance had improved to the extent that DSS held a Family Involvement Meeting "to talk about reunification." At that point, DSS increased Ms. H.'s visitation with L.B., the visits became extended and unsupervised, and DSS moved the visit location to J.H.'s residence.

In February 2012, L.B.'s case was transferred to Caitlin Salmon who, at the time, was a foster care continuing worker. During her time with L.B.'s case, Ms. Salmon facilitated visits with L.B. Beginning on March 20, 2012, Ms. H. began to have overnight visits with L.B.

Ms. Salmon testified that, for the most part, "things were going pretty well." Ms. H. was "pretty consistent" and always tested negative when asked to do urinalysis. There were, however, some incidents that concerned Ms. Salmon. L.B.'s foster parents reported that L.B. was "extremely lethargic" when he returned from his first overnight visit.

On April 23, 2012, Mr. B. told Ms. Salmon that he had gotten into a physical altercation with Ms. H., which prompted Ms. H. to file for a Peace Order against him. At the Peace Order hearing, J.H. told Ms. Salmon about "lots of allegations against" Mr. B., including allegations of sexual abuse, which led Ms. Salmon to question whether it was

appropriate for L.B. to be around Mr. B.[8]  For a short period of time following each of these incidents, Ms. Salmon limited visitation with L.B. to unsupervised day visits before eventually reinstating overnight visits.

### *L.B.'s Brief Reunification with Ms. H.*

At some point between the end of April and the beginning of May 2012, Ms. Salmon transferred L.B.'s case to the "Families Now" unit, a nine-month "intensive program for children placed out of home either in foster care or kinship care," which was supervised by Maureen McKinley at DSS.[9]  On or about June 1, 2012, L.B. was returned to Ms. H.'s care.

The Families Now unit "continued to monitor the placement," and it provided numerous services to Ms. H., including financial assistance with cable, electricity, phone, groceries, daycare, and transportation expenses, as well as paying for out-patient drug and alcohol treatment.  During the first two months of L.B.'s reunification with his mother, Ms. McKinley experienced difficulty monitoring his well-being because Ms. H. frequently was unavailable for visits, and she refused to provide documentation with respect to the services she was supposed to be receiving, particularly mental health and substance abuse treatment.  On June 27, 2012, DSS held another Family Involvement Meeting, during which it was decided that L.B. would remain with Ms. H.

---

[8] Caitlin Salmon testified that Protective Services investigated the allegations against Mr. B., but it ultimately determined that there was insufficient evidence to substantiate the claims.

[9] The Families Now unit has since been discontinued in Harford County.

On August 27, 2012, L.B. again was removed from Ms. H.'s care and put back into foster care. The decision to remove L.B. from Ms. H. was based on a combination of issues, including a police report indicating that Ms. H. and her mother got into a physical altercation, as well as Ms. H.'s continuing failure to make herself available to DSS workers and provide documentation that she was receiving mental health treatment.

On October 22, 2012, Ms. McKinley created a new Service Agreement, but Ms. H. would not sign it. At some point in the fall of 2012, Ms. H. began receiving substance abuse treatment from the Turning Corners program. She subsequently was discharged for failure to comply with the program.

### L.B.'s Brief Placement with Family

On September 14, 2012, L.B. was placed in the care of Ms. H.'s brother, S.H.(H), and his wife, S.H.(W).[10] S.H.(W) set up a weekly visitation schedule for Ms. H. to visit L.B. For the first three weeks, Ms. H. "showed up on a regular basis." After that initial period, however, Ms. H. frequently would schedule a visit but then fail to show, without explanation. During the visits that Ms. H. did attend, she often would spend a disproportionate amount of the time questioning S.H.(W) regarding why she could not have unsupervised visits with L.B. and trying to convince S.H.(W) that she could be left alone with L.B., leaving little time actually spent with her son. Ms. H. grew "increasingly irritable over the situation."

---

[10] Because Ms. H.'s brother and sister-in-law share the same initials, S.H., we will distinguish them as husband (H) and wife (W).

In January 2013, S.H.(W) received a phone call from J.H. informing her that Ms. H. had been hospitalized after "walking down the street and [saying] there were demons coming after her." Ms. H. later told S.H.(W) that her hospitalization was precipitated by a drug overdose and "cotton fever."[11] While Ms. H. was in the hospital, she became aware that she was pregnant with I.L.

After approximately five months of caring for L.B., the S.H.'s decided that they could no longer care for him, in part because of the "friction" and "family conflict" involving Ms. H.'s mother. S.H.(W) testified that they received "constant phone calls[,] harassment and . . . threats" from Ms. H. and J.H. Ms. H. remained at odds with S.H.(W) because "she was not willing to bend the rules." Ms. H. would curse at S.H.(W), call her names, and threaten to beat her up. S.H.(W) also testified that Ms. H. and her mother would "randomly show up at [their] house and start[] arguments . . . in front of [their] children."

Recognizing that their current situation was unsustainable, both financially and with respect to the continual harassment, S.H.(H) reached out to L.B.'s maternal grandfather, D.H., for help. D.H. responded: "That's your sister and that's your nephew, it's not my problem."

---

[11] Ms. H. testified that her hospitalization was not because of a drug overdose, but rather, because she received an infection in her blood from drug use, and her condition was worsened by an allergic reaction to medication that she took at the hospital.

S.H.(H) testified that S.H.(W) "freaked out" when a DSS worker suggested, around the time of Ms. H.'s January hospitalization, that they may need to adopt L.B. if he was to remain with them. On February 26, 2013, another Family Involvement Meeting was held, and L.B. was transitioned back to his foster family.[12]

At the February 2013 meeting, D.H., indicated that he and his wife were interested in caring for L.B. DSS subsequently conducted a home study, but D.H. and his wife were not approved because Ms. McKinley had several concerns about their suitability. First, they failed to provide certain information to DSS in a timely manner, including three referral references. Second, Ms. McKinley was concerned that they would simply give L.B. back to Ms. H. after receiving custody of him or, due to D.H.'s "contentious relationship" with his daughter, fail to follow DSS instructions with respect to permitting or denying visitation with L.B. Finally, Ms. McKinley took into account that L.B. was spending a significant amount of time with his foster parents, whereas D.H. had not requested to visit L.B. at all during that time.

On April 10, 2013, the circuit court changed L.B.'s permanency plan to adoption. In July 2013, L.B.'s case was transferred to Melissa Wetters in the DSS Home Services unit. Ms. Wetters testified that L.B. remained in foster care because Ms. H. continued to have unaddressed substance abuse and mental health issues, and she "had not progressed in her previous service agreements."

---

[12] S.H.(H) and S.H.(W) subsequently separated. S.H.(H) indicated a desire to care for the children, although he was not sure if there was room in his new home.

From July to October 2013, Ms. H. regularly attended visits with L.B., which were facilitated by Ms. Wetters, but she "spent most of the visits venting" to Ms. Wetters. On July 25, 2013, Ms. Wetters presented a new Service Agreement to Ms. H. Ms. H. refused to sign the agreement, and instead, she directed Ms. Wetters to her attorney. Ms. Wetters testified that, although she "talked with [Ms. H.] extensively about mental health treatment," Ms. H. "refused to engage with that." Ms. Wetters also talked with Ms. H. "about anger management evaluation and classes, which was a previous term on her Service Agreement, and [Ms. H.] indicated that she had previously completed that, and she was going to [provide] documentation, but she did not."

### *Initiation of the Department of Social Services' Interest in I.L.*

The Harford County Department of Social Services initially took interest in I.L. on September 18, 2013, when the department received a referral that both Ms. H. and I.L. tested positive for cocaine and opiates at the time of I.L.'s birth, and Ms. H. admitted to using heroin on the day of delivery. On September 20, 2013, Pamela Abramson, a DSS Child Protective Services Investigator, visited the hospital where I.L. was delivered and was informed by hospital staff that I.L. was exhibiting signs of withdrawal and needed medication, but Ms. H. was withholding consent. Ms. Abramson issued "shelter papers," and I.L. subsequently was placed in foster care.

Shortly after I.L. was born, Ms. H. began to use heroin and cocaine regularly. She failed to attend an intake for a substance abuse evaluation.

On October 10, 2013, a Family Involvement Meeting was held to discuss I.L.'s situation. Ms. Abramson testified that, during the meeting, Ms. H. and I.L.'s father became angry and "stormed out of the meeting." Around that time, DSS evaluated family members as potential resources for I.L. Ms. Abramson testified that Ms. H.'s father, D.H., approached her, but he "stated he did not want to be a resource at that time." DSS also investigated Ms. H.'s mother, J.H, but it concluded that she would not be a suitable resource. DSS was concerned about her mental health issues, she already was caring for a severely disabled child, and she "enable[d]" Ms. H. and had a "strained relationship" with her.

On October 23, 2013, the court designated I.L. a CINA. The court ordered that I.L. be placed into foster care and that the "primary Permanency Plan" be "reunification."

### DSS Attempts to Reunify I.L. with Ms. H.

From October 2013 to May 2014, the department's goal was to get I.L.'s parents stable by addressing their substance abuse, mental health, and housing issues. During those months Ms. H. received some substance abuse treatment, but her mental health issues remained unaddressed and her housing situation unstable.

In March 2014, Ms. Little created a new Service Agreement, which Ms. H. signed. Ms. H. was "minimally" compliant with the terms of the Agreement. Although Ms. H. began to address her substance abuse problem, she did not complete psychological evaluation, seek mental health treatment, obtain steady housing and employment, or complete programs for anger management and parenting skills.

-13-

In May 2014, I.L.'s case was transferred to Noel Francis, a DSS adoption worker. Ms. Francis referred Ms. H. for substance abuse treatment and arranged for her to receive an updated psychological evaluation. Ms. H. refused to see DSS's psychologist, however, stating that she and her attorney would have an evaluation done by another evaluator. Ms. H. never provided any documentation to Ms. Francis indicating that she completed a psychological evaluation.

On October 6, 2014, Ms. H. gave birth to her daughter I.H.L.[13] Like her two brothers before her, I.H.L. was born with drugs in her system and suffered from withdrawal symptoms.

From August to November 2014, Ms. H. was permitted to have regular unsupervised visits with I.L. Ms. Francis testified that DSS switched Ms. H.'s visits to unsupervised because Ms. H.'s behavior with I.L. had "always been very appropriate" up to that point, and she was reassured by the fact that Ms. H. was, at that time, in the Dayspring program, "which was a supervised facility," and Ms. Francis "had a lot of contact with the staff" there.

### I.L.'s Permanency Plan Changes to Adoption

Around the end of November 2014, Ms. H. began to "express[] a lot of frustration with the Dayspring program," culminating in her going "AWOL from the program." Ms. H. was absent from the Dayspring program during the "whole week of Thanksgiving." In December 2014, Ms. H. returned to Dayspring, whereupon she was terminated from the

---

[13] I.H.L. is not a party to these proceedings.

program for noncompliance, although she was permitted to reside at their facility until the end of the month.

Ms. H.'s behavior subsequently became very erratic. On December 10, 2014, a Dayspring employee told Ms. Francis that Ms. H. had broken an oven door, thrown things out of a window, and barricaded herself inside her apartment. The employee also told Ms. Francis that Ms. H. was "not being compliant with mental health treatment," was "not taking any psychiatric medication," and they suspected she was not taking her substance abuse medication appropriately.

In December 2014, S.H.(H), Ms. H.'s brother, approached Ms. Francis and conveyed his interest in becoming a placement resource for I.L. Ms. Francis testified that, although S.H.(H) completed the required training, he was "very clearly aware that [a] home study needed to be completed by Harford County, and a letter was sent to him to that effect," but he never followed through with the home study and never contacted Ms. Francis about it despite having her personal cell phone number.[14]

---

[14] At trial, S.H.(H) acknowledged that, at a Family Involvement Meeting held on January 6, 2015, he agreed to complete a home study within 180 days, but instead of having the Harford County DSS complete the study, he "was asking Baltimore County to do it," because he was "leery of some of the people" at the Harford County DSS. S.H.(H) testified that he expected that the home study would be scheduled sometime after he completed his class, and he waited for that to occur, but "nothing happened." He stated that he left a message with DSS in March 2015, indicating that he had completed his class, but that was the last time he had contact with the Department.

In January 2015, Ms. Francis suspended Ms. H.'s visitation with I.L. She testified that Ms. H. had cancelled "pretty much the whole month of January." Ms. H.'s cancellations gave Ms. Francis cause for concern, particularly one occasion where Ms. H. called to cancel a visit, claiming that she had no transportation. When Ms. Francis offered to send a cab, Ms. H. responded: "No, I don't have a babysitter, and I'm moving out of the state."[15]

In January 2015, the court changed I.L.'s permanency plan to adoption. In April 2015, Ms. Francis referred Ms. H. to the Recovery Court Program, but Ms. H. did not follow through with the referral.

In the months leading up to the TPR proceedings, Ms. H. became hostile toward Ms. Francis, sending her threatening text messages, including one claiming that she was going to have Ms. Francis charged with kidnapping and another stating: "You're going to pay the price one day."

### *Procedural History*

On July 16, 2013, DSS filed a Petition for Guardianship over L.B. On May 29, 2014, Ms. H. consented to the termination of her parental rights to L.B., and the juvenile court entered a guardianship order on the same date. Ms. H. then appealed, arguing that Ms. H.'s consent to terminate her parental rights was defective. On December 18, 2014, this Court remanded the case for further proceedings.

---

[15] At that time, Ms. H. retained custody of her daughter, I.H.L.

On January 9, 2015, DSS filed a Petition for Guardianship over I.L. Between August 2015 and February 2016, the circuit court held consolidated hearings.

### *TPR Proceedings Testimony*

At the consolidated TPR hearings, in addition to the testimony discussed *supra*, Ms. Francis testified about her lingering concerns regarding Ms. H.'s fitness to parent. She noted that Ms. H. "never had any stable housing" or employment, had "not complied with any of the service agreements," had not been in substance abuse treatment since December 2014, refused to undergo psychological evaluation or obtain mental health treatment, and minimalized I.L.'s developmental problems. Ms. Francis did state, however, that all of Ms. H.'s urinalysis screenings had been negative.

In support of her case, Ms. H. called addictions specialist Dr. Toyin Opesanmi, who was treating her drug addiction at the time. Dr. Opesanmi testified that she provided post-detox Suboxone maintenance treatment as part of her family medical practice. She began treating Ms. H. in October 2014, after Ms. H. successfully graduated from the Powell substance abuse program.

Dr. Opesanmi provided verbal counseling during every visit, and Ms. H. was "very teachable" and "[v]ery easily redirected." Dr. Opesanmi acknowledged that she was not a licensed counselor, but rather, she provided counseling as part of a holistic practice, and if a mental health issue was "over [her] head," she would refer them to a psychiatrist. She testified that Ms. H. needed counseling from an independent counselor as part of her

treatment, but she had not referred Ms. H. to one because Ms. H. had "her own counselor coming to [her]."

Ms. H. testified that, after graduating from the Powell program, she moved to a motel in Delaware to prevent DSS from becoming involved with her daughter, I.H.L. She did some "side jobs" and was relying on public assistance and family members for income. In reference to questioning about various service agreements, she stated that, in the past, she had to "do whatever [Child Protective Services] CPS tells me in order to have my kids."

### The Circuit Court's Findings

On February 3, 2016, the circuit court granted DSS' petitions for guardianship. It found DSS' witnesses to be credible, and the testimony of Ms. H.'s witnesses generally to be lacking in detail and credibility.

The court then addressed the statutory factors set forth in Maryland Code (2012 Repl. Vol.) § 5-323(d) of the Family Law Article ("FL"), which a court must consider in a TPR case. With respect to the services offered to the parent before placement, the court found that DSS provided "a full panoply" of timely services, including "rental housing assistance, drug treatment, mental health treatment, the Infants and Toddlers Program . . . , Food Stamps, Medical Assistance, transportation money, employment referrals, parenting classes, anger management, . . . [and] cell phones." With respect to whether DSS and Ms. H. had fulfilled their obligations, it found that DSS "followed through with everything it said it would do," but Ms. H. failed to comply with her obligations with respect to drug

treatment, mental health evaluation and treatment, stable and verifiable housing, and stable and verifiable employment.

With respect to Ms. H.'s efforts to adjust to her "circumstances, condition, or conduct" to make it in her children's best interest to return home, the court first considered Ms. H.'s contact with her children. The court found that Ms. H. did not maintain consistent contact with either L.B. or I.L., noting that she attended only 36 of 63 visits with L.B., and that her consistency with respect to I.L. was sporadic. It then found that Ms. H. was "not able to adjust to her circumstances because she hasn't sought treatment that is required," and instead of working with the Department, she "threatened and verbally accosted a DSS worker, which led to a Final Peace Order being entered against her on September 1, 2015."

With respect to whether Ms. H. had a parental disability that affected her ability to consistently care for her children, the court found that Ms. H. was diagnosed with PTSD, polysubstance abuse, and "a mood disorder or bipolar disorder," and she would "need at least six months of clean and sober living and mental health treatment before she is even able to parent with assistance." The court found that additional services would not "bring about a lasting parental adjustment so that the children could be returned home within an ascertainable period of time not to exceed 18 months from the date of placement." It explained that "[b]oth parents . . . testified that they have a deep mistrust of DSS or any of the agencies or other organizations to which referrals have been made," and "neither parent has ever availed themselves of any of the services" that were offered to them by DSS.

Although the court found that the factor with respect to abuse and neglect was "not a relevant consideration in this case," the court was required to consider a related factor: Whether, upon birth, the child tested positive for drugs and the parent refused drug treatment. The court found that Ms. H. tested positive for opiates when she gave birth to both L.B. and I.L., and in I.L.'s case, Ms. H. refused to consent to treatment. The court also noted that, although Ms. H.'s daughter I.H.L., was not a party to the proceedings, it was a concern that she also was born addicted to drugs.

With respect to treatment for her addictions, the court found that Ms. H. "has had five different substance abuse providers and only successfully completed one." It recognized that Dr. Opesanmi's testimony generally was supportive of Ms. H.'s case in some aspects, but it stated that her testimony "did nothing to refute the overwhelming quantum of evidence put on by the department." In particular, the court stated that, although "counseling is a necessary component of a certified drug treatment program, [Dr. Opesanmi was] only a certified provider to dispense . . . medication . . . , not to provide counseling, which she clearly stated would be . . . outside of her qualifications." The court stated that it gave "low" weight to Dr. Opesanmi's testimony because she did not testify to "a reasonable degree of medical certainty," and she only dispensed medication, which was "not the same as proving certified addictions counseling."

Finally, with respect to the children's emotional ties to Ms. H. and others, the court found that neither child had an emotional connection with their mother or siblings. On the

other hand, it found that both L.B. and I.L. had become well-adjusted to their loving foster families.

The court concluded as follows:

> So having considered all these factors, this Court does find by clear and convincing evidence that it is in [L.B.'s] and [I.L.'s] best interest to grant the department's petition, and accordingly, the Court issues an Order to the local department with the right to consent to adoption and long-term care short of adoption, thereby terminating the natural parental rights of [Ms. H.]"

On February 9, 2016, the court issued written orders in both cases terminating Ms. H.'s parental rights and granting guardianship to DSS. In each order, the court included the following:

> WHEREAS, as a result of a trial on the merits being held before this Court and the Court having considered all the factors outlined in [FL § 5-323], and the Court having found by clear and convincing evidence that the natural mother is an unfit parent and that extraordinary circumstances exist and that it is in the child's best interest that the natural mother's parental rights be terminated.

## STANDARD OF REVIEW

We review orders terminating parental rights using three interrelated standards. The Court of Appeals recently set forth the standard of review as follows:

> "[W]hen the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8-131(c)] applies. [Second,] [i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion."

*In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 100 (2010) (quoting *In re Adoption/Guardianship of Victor A.*, 386 Md. 288, 297 (2005)). *Accord In re Adoption/Guardianship of Jasmine D.*, 217 Md. App. 718, 733 (2014).

## DISCUSSION

### I.

### Termination of Ms. H.'s Parental Rights

Ms. H. argues that the court erred in terminating her parental rights. In support, she contends:

> [Ms. H.'s] past failures in drug treatment, mental health counseling, housing, and employment did not necessarily make her unfit to remain in a legal relationship with her children, in light of her current success in recovering from her addiction and her demonstrated ability to parent an infant without [S]tate intervention. There was no evidence presented that [Ms. H.'s] infant child, [I.H.L.], was not receiving proper care and attention, so it follows that [Ms. H.] was sufficiently fit to maintain a relationship with L. and I. with the goal of eventually having custody of them returned to her. The court failed to explain how, if at all, [Ms. H.'s] failures rendered her unfit to remain L. and I.'s legal parent, or created exceptional circumstances that made it contrary to L. and I.'s best interests to remain in the Constitutionally-protected relationship with their natural parent.

The Department contends that the circuit court "properly terminated Ms. H.'s parental rights to [L.B.] and [I.L.] after finding exceptional circumstances and that Ms. H. was unfit to parent them due to her failure to remedy her chronic substance abuse and stabilize her living situation." It disagrees with Ms. H.'s contention that the juvenile court "'failed to articulate how its findings on the factors in [FL] § 5-323(d) lead to a conclusion that [Ms. H.] . . . is unfit or that exceptional circumstances exist,'" stating that the extensive factual findings issued from the bench, "combined with the written TPR orders, more than

adequately show how the court concluded that Ms. H. is an unfit parent and that exceptional circumstances warrant termination of her parental rights."

The Department also disagrees with Ms. H.'s assertion that the court's decision should be reversed because "[t]he uncontroverted evidence was that [Ms. H.] had an infant, [I.H.L.], in her care, and she was providing proper and ordinary care for her without the need for [S]tate intervention." It contends that Ms. H.'s "frequent moves and failure to keep the Department apprised of her residence," along with her intentional move to Delaware "to prevent the Department from having any involvement with her infant's care," could "explain why [I.H.L.] was not in the Department's care." In any event, DSS argues that the circuit court "expressly discredited the testimony of Ms. H. and the witnesses she called about her ability to parent."

Appellee children make similar arguments. They contend that the circuit court "correctly granted the guardianship petitions . . . after properly considering the clear and convincing evidence that the parents were substance abusers and not compliant with recommended treatment, demonstrating that the parents were unfit and that termination was in the best interests of the children."

### A.

### The Law on TPR Proceedings

Before we address Ms. H.'s specific claims, we first review the law applicable to TPR cases. This Court has recognized the "fundamental right of parents generally to direct and control the upbringing of their children." *Brandenburg v. LaBarre*, 193 Md. App. 178,

-23-

186 (2010) (quoting *Koshko v. Haining*, 398 Md. 404, 422 (2007)). We have noted, however, that a parent's fundamental right to raise his or her child, however, is not absolute. That right "must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 497 (2007). Parental rights may be terminated, but it "is a 'drastic' measure, and should only be taken with great caution." *In re Adoption/Guardianship of Harold H.*, 171 Md. App. 564, 576 (2006) (quoting *In re Adoption/Guardianship Nos. J9610436 & J9711031*, 368 Md. 666, 699 (2002)).

In determining whether to terminate parental rights, "it is unassailable that the paramount consideration is the best interest of the child." *In re Adoption/Guardianship No. T00032005*, 141 Md. App. 570, 581 (2001). *Accord Ta'Niya C.*, 417 Md. at 112 ("[T]he child's best interest has always been the transcendent standard in adoption, third-party custody cases, and TPR proceedings."); *Rashawn H.*, 402 Md. at 496 ("[T]he best interest of the child remains the ultimate governing standard."). It is generally presumed "that it is in the best interest of children to remain in the care and custody of their parents." *Id.* at 495. That presumption, however, "may be rebutted upon a showing either that the parent is 'unfit' or that 'exceptional circumstances' exist which would make continued custody with the parent detrimental to the best interest of the child." *Id.*

FL § 5-323(b) gives juvenile courts the authority to terminate an individual's parental rights. It provides:

> *Authority.* — If, after consideration of factors as required in this section, a juvenile court finds by clear and convincing evidence that a parent is unfit to

remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests, the juvenile court may grant guardianship of the child without consent otherwise required under this subtitle and over the child's objection.

**B.**

**Court's Explanation for Decision**

We address first Ms. H.'s contention that the circuit court did not properly articulate *how* its factual findings lead to its conclusions regarding parental unfitness, the existence of exceptional circumstances, and the best interest of the child. For the reasons set forth below, we are not persuaded.

In *Ta'Niya C.*, 417 Md. at 110, the Court of Appeals approved the following framework for courts to apply in TPR cases:

> "The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, **determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, <u>and, if so, how</u>.** If the court does that—articulates its conclusion as to the best interest of the child in that manner—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance."

(emphasis added) (quoting *Rashawn H.*, 402 Md. at 501).

Here, although the circuit court could have stated more expressly how its factual findings led to its conclusion of parental unfitness and exceptional circumstances, we agree with appellees that a review of the court's oral statements and written order makes clear

that the court found unfitness and exceptional circumstances based on its careful evaluation of the statutory factors and its conclusion that Ms. H. failed to stabilize her living situation so that she could be a responsible parent to her children. The circuit court explicitly credited the Department's witnesses and found that Ms. H. failed to address and remedy the conditions that precipitated the initial removal of her children. It found that Ms. H. was offered a "full panoply of services," starting in 2009, to help her become a responsible parent, but she failed to take advantage of many of those opportunities. Ms. H.'s continuing failure to become sober and stable within a reasonable amount of time, her inconsistent presence in the lives of L.B. and I.L., and her inability to work with the Department to achieve reunification, convinced the court that she was unfit to remain in a parental relationship with L.B. and I.L. and that there were exceptional circumstances that made a continuation of the parental relationship detrimental to the best interests of the children. We conclude that the record adequately reflects the rationale of the circuit court in determining that Ms. H. was an unfit parent and that exceptional circumstances justified termination of her parental rights.

## C.

### Sufficiency of the Evidence

Ms. H.'s second contention is that the circuit court erred in terminating her parental rights because there was insufficient evidence to support the court's finding that she was unfit to have a continued parental relationship with her children or that there existed exceptional circumstances that made a continued parental relationship detrimental to the

children's best interest. In support, she asserts that there was "uncontroverted evidence" that she was "providing proper and ordinary care for [I.H.L.] without the need for [S]tate intervention," and therefore, "it follows" that she was "sufficiently fit to maintain a relationship with" L.B. and I.L. We are not persuaded.

As appellees note, there was no evidence to support the assertion that Ms. H. was properly caring for her infant child. Indeed, Ms. H. admitted that she moved to Delaware for the express purpose of preventing DSS from becoming involved with her infant daughter. Ms. H. cannot prevent the State from evaluating her fitness as a parent with respect to I.H.L. and then insist that the court simply accept her self-serving evidence that she is properly caring for her daughter. This contention is devoid of merit.[16]

The circuit court's factual findings were not clearly erroneous, and it was proper for the court to credit the Department's overwhelming evidence that Ms. H. had not sufficiently addressed her problems to remain in a parental relationship with L.B. and I.L. Accordingly, the court's ultimate determination to terminate Ms. H.'s parental rights was supported by the record, and it did not constitute an abuse of discretion.

---

[16] Indeed, we note that I.H.L., similar to her brothers, was born addicted to drugs, and Ms. H. had not, at the time of the hearing, secured adequate housing or steady employment, received the addiction counseling that she needs, or addressed her mental health issues. Ms. H.'s move to Delaware, however, prevented the Department from investigating Ms. H.'s fitness to parent I.H.L.

## Guardianship Decision

Ms. H. next argues that the circuit court erred by granting guardianship to the Department, as opposed to placing the children in the care of relatives, such as "their grandparents or uncle, all of whom testified to their ability to provide care for their relatives." She asserts that, "[w]here it is possible for a child, who cannot be returned to a parent, to be placed with a relative, the relevant statutes require that the Department facilitate a relative placement."[17]

The Department argues that Ms. H. "lacks standing on the issue," and therefore, "this Court need not address" her arguments. It contends that, "[g]iven that the juvenile court properly terminated Ms. H.'s parental rights over [L.B. and I.L.] after affording her a full and fair opportunity to litigate those rights, Ms. H. is now a legal stranger to the children who has no duties, no obligations, and no rights toward the children," and therefore, she lacks standing to attack the "court's separate order awarding guardianship of the children to the Department." The Department argues that, "although Ms. H. has an

---

[17] We note that the record reflects that the Department explored potential relative placement, but it determined that was not a viable option. Ms. H. did not argue below that this assessment was erroneous, and our review of the record does not reflect any request by Ms. H. that the court place her children with relatives. Under these circumstances, it is difficult for Ms. H. to persuasively argue that the court erred or abused its discretion in granting guardianship to the Department, as opposed to relatives. *See Weatherly v. Great Coastal Express Co.*, 164 Md. App. 354, 386 (2005) (appellant may not be heard to complain on appeal about a ruling the court was never asked to make). The Department does not argue, however, that Ms. H. has failed to preserve this issue for this Court's review, and therefore, we will proceed to address the arguments presented by the parties.

interest in the circuit court's guardianship order, she holds no standing to challenge an aspect of that order that pertains to third parties, i.e., the court's choice of guardian for the children."

In any event, DSS argues, even if Ms. H. had standing on the issue of the children's placement, her claim is without merit. DSS asserts that "it was within the juvenile court's discretion to award guardianship to the Department," and the evidence "militate[d] against" placing the children with Ms. H.'s family.

Appellee children argue that the circuit court "is charged, first and foremost, with making decisions that are in the best interest of the child." They contend that "the Department considered placement with various relatives and determined that placement with those relatives was contrary to the best interests of L.B. and I.L., who have each spent several years, and the better part of their lives, with their foster families."

In her reply brief, and in a supplemental brief filed after oral argument, Ms. H. argues that she does have standing to challenge the court's decision to grant guardianship of her children to the Department rather than to a relative. She asserts that "denial of a request to place the children with relatives is not an issue that is separate from the other issues that arise at a termination hearing," and "when a trial court denies a request by a parent to grant guardianship to a relative rather than the Department, the parent has standing to challenge that decision on appeal as an abuse of discretion."[18] Ms. H. further

_____

[18] As noted, Ms. H. has not asserted that she made, and we could not find in the record, any request that the court grant guardianship of a child to a relative.

asserts "that a parent retains the post-guardianship right to notice of the post-guardianship review hearings and the right to be heard and participate supports the proposition that parents have standing *vis a vis* the subject child even after their legal relationship has been extinguished."[19]

Before reaching the merits *vel non* of Ms. H.'s claims, we first must address the threshold question whether she has standing to challenge the placement of L.B. and I.L. "One requirement of justiciability is that the plaintiff have standing in the sense that the person is entitled to invoke the judicial process in a particular instance." *Adams v. Manown*, 328 Md. 463, 480 (1992). As this Court recently explained in *State v. Phillips*, 210 Md. App. 239, 257 (2013):

> "[S]tanding is a threshold issue; a party may proceed only if [he or she] demonstrates that he has a real and justiciable interest that is capable of being resolved through litigation." *Norman v. Borison*, 192 Md. App. 405, 420 (2010), *aff'd on other grounds*, 418 Md. 630 (2011). "In order to have standing, a party must demonstrate an 'injury-in-fact,' or 'an actual legal

---

[19] In this regard, Ms. H. relies on: (1) Maryland Code (2012 Repl. Vol.) § 5-326 of the Family Law Article ("FL"), which addresses guardianship review hearings; and (2) *In re Adoption/Guardianship Nos. 11387, 11388*, 354 Md. 574 (1999), which held, in addressing a prior statute regarding post-guardianship review hearings, that a natural parent whose parental rights had been terminated had a statutory right to participate in the hearing. As the Department points out, the cited case is of limited value because § 5-326 replaced the prior statute, and the new statute reflects the General Assembly's view that a parent who has had his or her parental rights terminated does not have party status in guardianship review hearings. FL § 5-326(a)(3)(iii) ("[A] parent is not a party [to a guardianship review proceeding] solely on the basis of the right to notice or opportunity to be heard or participate at a guardianship review hearing."). This statute, which was not referenced prior to argument, is not instructive to the issue on appeal, i.e., whether a parent who has had his or her parental rights terminated has standing, on appeal from that order, to challenge the court's additional order awarding guardianship of the child to the Department.

stake in the matter being adjudicated.'" *Id.* (quoting *Hand v. Mfrs. & Traders Trust Co.*, 405 Md. 375, 399 (2008)).

(parallel citations omitted).

The question presented here is whether, after the circuit court terminated Ms. H.'s parental rights, she had standing to challenge the court's order granting guardianship to the Department. The Maryland appellate courts have held that, once there has been a final termination of parental rights, the parents of the child are no longer interested parties with standing to challenge subsequent legal proceedings regarding the children. *See Hale v. Cramer*, 254 Md. 592, 597 (1969) (where the unwed, natural mother of a child consented to a guardianship with the right to consent to adoption, she had no standing to challenge the guardian's decision to consent to the child's adoption or to intervene in the subsequent adoption proceedings); *Qureshi v. Dir., Prince George's County Dep't of Soc. Servs.*, 11 Md. App. 615, 622-23 (1971) (mother's consent to petition for guardianship with consent for adoption of her newborn baby terminated her parental rights, and mother lacked standing subsequent to the issuance of the final guardianship decree to challenge DSS procedures). *See also* FL § 5-325(a) (an order granting guardianship of an individual "terminates a parent's duties, obligations, and rights toward the individual").

The above cases, however, dealt with situations where the termination of parental rights was deemed to be final in a situation where: (1) there was no challenge on appeal to the guardianship order; or (2) the appellate court affirmed the initial order. It was in that context that the courts held that the parents had no standing to challenge subsequent legal

-31-

proceedings regarding the children. *Hale*, 254 Md. at 597; *Qureshi*, 11 Md. App. at 622-23.

Other courts have reached similar conclusions and held that, when a party fails to challenge the termination of his or her parental rights, the party loses any interest in the guardianship of the party's child. For example, in *In Interest of D.B.*, 483 N.W.2d 344, 345 (Iowa Ct. App. 1992), the juvenile court terminated the mother's parental rights, denied the aunt's request for guardianship, and granted custody to the State. The Court of Appeals of Iowa held that the mother, in failing to challenge the termination of her parental rights, allowed that portion of the order to become final, and because the termination of her parental rights concerning her child divested her "of all privileges, duties and powers with respect to the child," she relinquished any legally recognizable interest she would have concerning the guardianship or custody of her child. *Id.* at 346. Because the mother was not, therefore, aggrieved by the court's order giving guardianship of the child to the State, as opposed to the child's aunt, she did not have standing to challenge the court's placement of the child following the termination. *Id.* at 345-46.[20] *Accord Ryder v. State*, 917 S.W.2d 503, 505 (Tex. App. 1996) (parent lacked standing to challenge child's placement where the termination of her parental rights became final after she failed to perfect an appeal from the termination decree); *State, in interest of J.S.*, 272 P.3d 169, 170 (Utah Ct. App. 2012) (parents had no standing to appeal placement of children with foster parents instead of

_____

[20] Under these circumstances, the court stated that it was not required to entertain the appeal. *In Interest of D.B.*, 483 N.W.2d 344, 346 (Iowa Ct. App. 1992). The court did, however, address the merits of the claim, finding it to be without merit.

relatives because, once parental rights were terminated, a finding not challenged, parents had no protected interest in the children's custody).

Here, however, Ms. H. has appealed the propriety of the court's order terminating her parental rights. The parties have not cited, and we have not found, any Maryland case addressing the issue whether, in an appeal challenging an order terminating parental rights, the parent retains standing to challenge the court's decision, made during the same proceedings, regarding guardianship of the children.

Other courts, however, have addressed the issue, with differing results. Some courts have found that parents do not have standing to challenge the placement of their children once an appellate court affirms the termination of their parental rights. For example, in *Matter of Adoption of J.S.P.L.*, 532 N.W.2d 653 (N.D. 1995), father appealed from a judgment terminating his parental rights and granting a petition to adopt the children. On appeal the Supreme Court of North Dakota upheld the trial court's ruling terminating father's parental rights. *Id.* at 665. With respect to father's claims regarding the adoption of the children, the court stated that once it concluded that the trial court properly terminated father's parental rights, father "simply no longer has standing to object to anything concerning the children or their adoptive placement." *Id.* at 665. The court stated:

> "[A]fter a parent's parental rights have been terminated under the Act, that parent has no remaining residual rights of any kind, nor does that parent have any standing to raise any concerns or state any preferences regarding the ultimate placement of his or her child for adoption. When viewed from the perspective of the child, the parent whose parental rights have been terminated no longer exists."

*Id.* (quoting *In the Interest of C.B.*, 583 N.E.2d 107, 108 (Ill. App. Ct. 1991)). The court concluded that, because father did not have standing with respect to the issues raised regarding the adoption, it would not address them. *Id. Accord In re E.A.T.*, 989 P.2d 860, 862, 863-64 (Mont. 1999) (because appellate court upheld termination of a mother's parental rights, mother was divested of all legal rights with respect to the child and did not have standing to object to court's placement of the child with the State as opposed to the child's grandmother).[21]

Other courts, however, have held that parents whose parental rights have been terminated may challenge on appeal a trial court's orders with respect to matters other than the termination of their parental rights, such as placement and visitation, as long as those decisions occurred in the process of terminating the parental rights. For example, in *Logan v. Fairfax County Dep't of Human Dev.*, 409 S.E.2d 460, 461 (Va. Ct. App. 1991), a mother appealed an order terminating her parental rights and granting custody of her child to the Department of Human Development, as opposed to the child's maternal grandmother. The court upheld the decision to terminate mother's parental rights, but it rejected the Department's argument that the mother "lack[ed] standing to raise this issue since her residual parental rights [had] been terminated." *Id.* at 464. Noting that, by statute, the

---

[21] A distinction made by one court is that a parent may be able to show that he or she is aggrieved by a placement order, and thus have standing to contest it, if the placement order's reversal "advances the parents argument against terminating parental rights." *See In re K.C.*, 255 P.3d 953, 956-57 (Cal. 2011). No such claim is made in this case.

court was required to accompany an order terminating parental rights with an order granting custody, the Court of Appeals of Virginia stated that the child's

> placement was a part of the process terminating [the mother's] parental rights, not a separate proceeding. While [the mother] may lose standing to contest future matters relating to [the child] after her residual parental rights have been terminated, she has standing to contest any portion of the process terminating her rights, including [the child's] placement with the Department."

*Id. Accord In re Adoption of Rico*, 905 N.E.2d 552, 560 n.16 (Mass. 2009) (where "visitation order, however, was part of the adjudication of a termination proceeding to which the father was a party," father had standing to challenge visitation order on appeal).

Pursuant to these authorities, it is clear that, once an order terminating parental rights becomes final, the parent has no standing to challenge future matters regarding the child. In the situation where a parent challenges the termination of parental rights on appeal, however, we hold that the parent retains standing to raise on appeal an issue relating to "any portion of the process terminating her rights," including the child's placement with the Department. Once the termination of parental rights is affirmed on appeal, however, the order becomes final, and the parent no longer has standing to challenge decisions relating to the child, including the circuit court's order regarding placement of the child. Accordingly, because we have affirmed the order terminating Ms. H.'s parental rights, she no longer has standing to contest the court's decision regarding guardianship.

Even if Ms. H. had standing to contest the placement of the children, we would conclude that the trial court did not abuse its discretion in granting guardianship to DSS. Ms. H. identifies three potential family members that she argues would be preferable to

placing the children with the State, her mother, J.H., her brother, S.H.(H), or her father, D.H. The record reflects, however, as the Department asserts, that the circuit court "did not abuse its discretion when it awarded guardianship to the Department rather than to relatives who were not viable placement options."

With respect to J.H., the Department's witnesses testified that she already was caring for Ms. H.'s older child, and she had mental health problems of her own, harassed S.H.(H) and S.H.(W) when L.B. was in their care, and was not honest with and able to work to work with DSS. With respect to S.H.(H), the court found that L.B.'s prior placement with him and his wife was "thwarted by [Ms. H.'s] constant harassment, repeated requests for unsupervised [visits], name calling, and unfounded accusations." Moreover, DSS witnesses asserted, and S.H.(H) conceded, that he never completed the process to become certified as a placement resource for the children.

With respect to D.H., he and his wife were not approved as placements due to concern about their suitability, including their failure to provide information to the Department in a timely manner, their "contentious relationship" with Ms. H., which raised concern about whether they would follow the Department's instructions regarding visitation, and their lack of contact with the children. Indeed, when S.H.(H) asked for help with L.B., D.H. stated that it was "not [his] problem," and he refused to assist S.H.(H) with L.B.'s care.

Moreover, the court, as it was required to do, took into consideration the children's emotional attachments. The court found that L.B. and I.L. had become well-adjusted to

-36-

their respective foster families, but they did not have any significant relationships with their uncle or grandparents. Under these circumstances, even if Ms. H. had standing to contest the decision, we would conclude that the circuit court did not abuse its discretion in granting guardianship to DSS.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**